David BOEHM, and Penny Boehm, Appellants (Plaintiffs),

v.

CODY COUNTRY CHAMBER OF COMMERCE, a Wyoming corporation, Cody Country Gunfighters Club, an unincorporated association; The City of Cody, Wyoming, a Wyoming governmental entity; The Irma, Inc., a Wyoming corporation; David Bermingham, as an individual, and as president of the Cody Country Gunfighters Club; Tim Ward; and Todd Darr, Appellees (Defendants),

John Does I–X, inclusive, (Defendants).

No. 87–23.

Supreme Court of Wyoming.

Dec. 31, 1987.

Jeffrey A. Tennyson of Robert N. Williams, P.C., Jackson, and Frank D. Neville of Williams, Porter, Day & Neville, Casper, for appellants.

Anthony A. Johnson of Rector, Retherford, Mullen & Johnson, Colorado Springs, Colo., for appellees Cody Country Chamber of Commerce and Cody Country Gunfighters Club.

Michael K. Davis of Redle, Yonkee & Arney, Sheridan, for appellee City of Cody, Wyo.

J.N. Murdock of Reeves & Murdock, Casper, for appellee David Bermingham.

Marvin J. Johnson of Edwards and Johnson, Cheyenne, for appellee Irma, Inc.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

BROWN, Chief Justice.

Appellants, David and Penny Boehm, contend that appellees Cody Country Gunfighters Club (Club), the Cody Country Chamber of Commerce (Chamber), the City of Cody (City), the Irma, Inc. (Irma), David Bermingham, as an individual and as president of the Club, and Club members Tim Ward, Todd Darr, and John Does I–X, are liable to them in tort for injuries sustained by David Boehm during a mock gunfight that took place in Cody, Wyoming, on July 18, 1983, and for loss of consortium resulting from those injuries. The district court granted summary judgment in favor of appellees. Appellants base their appeal on the following three issues:

"I. Did the district court commit reversible error in granting summary judgment based upon a purported release where there is a genuine issue of material fact as to whether the parties to the agreement were in an employment relationship?

"II. Does the purported release in question violate public policy?

"III. Did the district court commit reversible error in granting summary judgment based upon a release where a genuine issue of material fact existed as to whether the parties relying upon the release, committed acts of willful and wanton misconduct?"

This court may decide a case "upon any point which in [our] opinion the ends of justice may require." *State Highway Commission v. Triangle Development Co.*, Wyo., 371 P.2d 408 (1962). Further, we may affirm a district court judgment on any legal ground appearing in the record. *Weyerhauser Co. v. Walters.*, Wyo., 707 P.2d 733, 737 (1985); cf. *Mentock v. Mentock*, Wyo., 638 P.2d 156, 160 (1981). Based on these precedents we will address this case using the following six issues:

I

Whether appellants are entitled to maintain a negligence action against the Club, Tim Ward, Todd Darr, other Club members and David Bermingham as Club president?

II

Whether appellants are entitled to maintain a negligence action against the City

of Cody under §§ 1–39–101 through 1–39–120, W.S.1979 (Cum.Supp.1983).

### III

Whether summary judgment favoring David Bermingham as an individual was proper?

### IV

Whether summary judgment enforcing the release in question as not violating public policy was proper?

### V

Whether summary judgment favoring appellees concerning alleged willful and wanton misconduct was proper?

### VI

Whether summary judgment favoring appellees concerning the alleged existence of an employment relationship between the parties was proper?

We will affirm.

Appellant David Boehm became a member of the Club in late 1981 or early 1982. The Club's only activity was staging regularly scheduled mock gunfights at the Irma Hotel and on 12th Street in Cody to help promote summer tourism. At the beginning of the 1982 membership year, and again in early 1983, Mr. Boehm signed a membership application. Both the 1982 and 1983 application forms contained an exculpatory clause which read:

"I furthermore understand that I shall perform as a Gunfighter entirely at my own risk and shall hold harmless and release the Cody Chamber of Commerce, its agents and employees, the Cody Country Gunfighters Club, its members, and the Irma Hotel, or any other location(s) sanctioned by the club from any and all claims and damages which said participant may incur from participation in any and all activities sanctioned by the Cody Country Gunfighters Club."

David Boehm testified that he read and understood the applications and the Club safety rules before he signed. David

Boehm's duties in the Club during 1983 included serving as Club Secretary and Chairman of the Safety Committee. As Club Secretary he was responsible for having all Club members fill out and sign the membership applications. As Chairman of the Safety Committee he helped in modifying club safety rules and generally overseeing the safety of the performances.

The 1983 performances took place four times a week, and were sponsored indirectly by Irma and other Chamber members, who contributed money to the Chamber for civic causes. This money was divided into separate accounts and distributed by the Chamber. Irma helped the Club by allowing use of the hotel for performances and meetings. Irma also held an annual dinner for the Club and offered each member one free drink after every performance.

The Club used a portion of 12th Street in Cody for the mock gunfights without ever getting express permission from the City to do so. The Chamber, Irma and the City, on a few occasions, made suggestions to Club members regarding performances and policies. These suggestions were discussed and acted upon by the Club membership or through its committees.

Appellee Bermingham was President of the Club from late 1980 through 1983. Appellees Ward, Darr and John Does I–X were 1983 club members. The Club itself was a loosely organized unincorporated association run by majority vote of its members and through committees. Club members were not paid for their participation in the performances through the 1983 summer season.

The performance script called for each mock gunfight to start when a group of "bandits," including David Boehm, would stage a fake robbery of the Irma Hotel. The "sheriff" (played by Bermingham) and his "good guys" would descend upon the forces of evil leading to an all out gunfight. The shooting would begin on the porch of the Irma Hotel, reaching a dramatic climax on 12th Street where hay bale props had been set up by Club members in a roped-off area. During the exchange of blank gunfire, David Boehm would rise up from be-

hind a hay bale and fire two shots in the direction of the "deputy sheriff" (played by Ward). The deputy would "die" from the shots and David Boehm would be gunned down in return fire. Eventually, the sheriff would blast the last bad guy, "Butch Cassidy" (played by David Boehm's brother), and emerge as the sole survivor to recover Irma's money.

During a July 18, 1983, performance, David Boehm received a severe injury to his right eye from a projectile of unknown origin. Speculation was that the object was either hardened glue used to seal the blank cartridges or a rock from the street propelled into Boehm's eye by the discharge of a pistol too close to the ground.

Appellants sued appellees[1] claiming damages based on theories of negligence, culpable negligence and willful and wanton misconduct.[2] Appellees denied liability, and the City, Irma and David Bermingham filed motions for summary judgment and supporting memoranda on July 10, August 22, and September 2, 1986, respectively. Appellants filed their opposition memorandum to the motions on August 29, 1986. The trial court issued an opinion letter on September 9, 1986, granting summary judgment in favor of all moving and non-moving appellees. A final order granting summary judgment as such was entered on December 2, 1986. This appeal is from that order.

I

 We first hold that appellants are not legally entitled to sue either the Club itself, or any of its members for their actions in furthering the mock gunfights. Members of an unincorporated association are engaged in a joint enterprise. Thus, the negligence of one member, acting in furtherance of the enterprise, is imputable to all. Allowing such a member to sue the association or another member, as a part of the association, would be tantamount to allowing that person to sue himself. *Bowser v. Hershey Baseball Ass'n*, 357 Pa.Super. 435, 516 A.2d 61, 63 (1986); *De Villars v. Hessler*, 363 Pa. 498, 70 A.2d 333, 14 A.L.R.2d 470, 473–474 (1950). The rule, however, does not preclude a member from suing another member in his individual capacity for individual negligence. This is because no person may negligently injure another without responsibility.

Appellants' original and amended complaints named as defendants: the Club (as an unincorporated association), members Ward, Darr, John Does I–X and David Bermingham as president *and* as an individual. We can only assume that appellants knew of the distinction discussed above when choosing their defendants, particularly since appellee Bermingham was sued as a member and as an individual. The record also shows that this issue was presented to the district court as a possible basis for granting summary judgment in David Bermingham's Memorandum in Support of His Motion for Summary Judgment, filed September 2, 1986. Consequently, David Boehm's action against the Club, its members and appellee Bermingham as a member is precluded. Further, because appellant Penny Boehm's negligence claims against appellees are for loss of consortium, they are derivative of David Boehm's ability to sue and fail with her husband's claims. *Weaver v. Mitchell*, Wyo., 715 P.2d 1361, 1369 (1986); Prosser and Keeton on Torts, § 125, p. 937 (5th Ed. 1984). Appellants' action against David Bermingham as an individual is dealt with under issue III.

II

 A party suing a Wyoming municipality will be allowed to pursue such an action only if it is brought in procedural and substantive compliance with the Wyoming Governmental Claims Act (Claims

1. The original complaint named the "Irma Hotel, Inc.," as a defendant. "Irma, Inc.," was substituted later in an amended complaint.

2. The City and the Chamber each cross-claimed against all other appellees-defendants for indemnity in the event liability was found. Based on the granting of summary judgment in favor of the City and the Chamber, these residual cross-claims are no longer viable.

Act).[3] *Dee v. Laramie County,* Wyo., 666 P.2d 957, 958–959 (1983); and *Troyer v. State Department of Health and Social Services, Division of Vocational Rehabilitation,* Wyo., 722 P.2d 158, 160 (1986). The Claims Act is a "close-ended" waiver of governmental immunity in that unless a claim asserted against a municipality falls within one of the statutory exceptions, it will be barred. § 1–39–104(a), W.S.1979 (Cum.Supp.1987); *Troyer v. State Department of Health and Social Services, Division of Vocational Rehabilitation,* supra. See generally Comment, *Wyoming's Governmental Claims Act: Sovereign Immunity With Exceptions—A Statutory Analysis,* XV Land & Water L.Rev. 619, 621–623 (1980). Once a negligence claim is determined to fall within one of the exceptions, the plaintiff still must prove all of the elements of negligence to prevail.

The possibility that the Claims Act might bar appellants' claims against the City in this case was before the trial court as a potential basis for granting summary judgment in the City's memorandum in support of its motion. Despite being apprised of the issue at that time, and also having proven procedural compliance with the Claims Act through pleadings and deposition testimony, appellants chose not to address the issue when opposing the City's motion. Likewise, appellants ignored the issue when it was again raised by the City on appeal.

Appellants assert three theories of recovery against the City despite ignoring the Claims Act. These three theories include: (1) that the City had a duty to maintain its streets in a safe manner; (2) that because the City benefitted economically from the performances it could be held liable; and (3) that the existence of a city ordinance prohibiting the discharge of a firearm created liability.

■ At the time of David Boehm's injury the only statutory exception to the Claims Act relevant to a city's control of its streets was § 1–39–111, W.S.1979 (Cum.Supp. 1983).[4] That section provided:

"A governmental entity is liable for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the *operation or maintenance* of public facilities within the jurisdiction of the employing governmental entity. (Laws 1979, ch. 157, § 1)" (Emphasis added.)

Before the statute was repealed we construed it to include a waiver of governmental immunity for *maintenance and operation* of state highways. *State v. Stovall,* Wyo., 648 P.2d 543, 549 (1982). In this case we hold that the scope of the § 1–39–111 exception set out in Stovall was not broad enough to encompass the type of accident incurred by David Boehm in the July 18, 1983, mock gunfight.

The thrust of appellants' complaints was that appellees were negligent in allowing the mock gunfights to go on using unsafe blanks. Appellants speculate that hardened glue from the blanks either hit David Boehm directly in the eye, or hit a rock or like object on the street and propelled that object into David Boehm's eye. We fail to see how a § 1–39–111 claim that the City negligently maintained or operated 12th Street is presented by these scenarios. Appellants have never alleged that 12th Street itself was unsafe due to improper maintenance or operation. David Boehm's own deposition testimony was that 12th Street was in good repair and had been in that condition at all times during the 1983 club performances preceding the July 18, 1983, accident. To allow appellants to sue the City for negligence because David Boehm happened to be standing on a city street that he admits was in a safe condition, when he was hit in the eye, allegedly as the result of an unsafe blank, or the erroneous discharge of a blank, would unreasonably expand the waiver of governmental immunity we recognized in *State v. Stovall,* su-

---

3. The Wyoming Governmental Claims Act consists of §§ 1–39–101 through 1–39–120, W.S. 1979 (Cum.Supp.1987).

4. Section 1–39–111 was repealed, 1986 Wyo.Sess. Laws by Ch. 89, § 3.

pra. Appellants' action based on the condition of the street is barred.

■ Appellants' other two theories of recovery against the City do not present a Claims Act challenge. The Claims Act, as effective in 1983, contained no waiver of governmental immunity based on the fact that a municipality received indirect economic benefit from an allegedly negligent event. We will not address appellants' third theory that the existence of a municipal ordinance prohibiting the discharge of a firearm somehow created actionable negligence liability. This theory is not sustained by anything akin to cogent argument or supporting authority in the record or on appeal, and does not deserve our review. *Trout v. Wyoming Oil and Gas Conservation Commission*, Wyo., 721 P.2d 1047, 1053 (1986). Appellants had no negligence action against the City.

### III

■ A motion for summary judgment places an initial burden on the movant to make a prima facie showing that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. Rule 56(c), Wyoming Rules of Civil Procedure. Once a prima facie showing is made, the burden shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact does exist. *England v. Simmons*, Wyo., 728 P.2d 1137, 1140–1141 (1986). We analyze challenges to a grant of summary judgment by reviewing the record in a light most favorable to the party opposing the motion giving him all favorable inferences that can be drawn from the facts. Id. Conclusory statements or mere opinions are insufficient, however, to satisfy an opposing party's burden. *Jones Land & Livestock Co. v. Federal Land Bank of Omaha*, Wyo., 733 P.2d 258, 263 (1987). We also point out that a district court may resolve a motion for summary judgment in favor of a non-moving party, and we can do the same when reviewing such a ruling. *Leithead v. American Colloid Company*, Wyo., 721 P.2d 1059, 1064 (1986).

■ We hold that appellee David Bermingham made a prima facie showing that no genuine issue of material fact exists regarding individual negligence on his part, and appellants have not put forth specific facts to refute that showing. As discussed in the trial court's opinion letter, David Boehm's own deposition testimony was that he was at a safe distance from appellee Bermingham during the July 18, 1983, performance, and that Bermingham did nothing differently than he had in other performances. There is no evidence that Bermingham actually reloaded the blanks involved. Further, appellants have never alleged that David Bermingham committed a battery or other intentional tort against David Boehm. Summary judgment in favor of appellee Bermingham in his individual capacity was proper.

### IV

■ Appellants contend that the exculpatory language contained in the 1983 Club membership agreement signed by David Boehm is invalid as against public policy. Exculpatory agreements, releasing parties from negligence liability for damages or injury, are valid and enforceable in Wyoming if they do not violate public policy. *Schutkowski v. Carey*, Wyo., 725 P.2d 1057, 1059 (1986).

■ Exculpatory agreements, often referred to as releases, are contractual in nature. *Kelliher v. Herman*, Wyo., 701 P.2d 1157, 1159 (1985). Interpretation of contractual agreements is a question of law for the courts, and we analyze exculpatory language considering the following four factors: (1) whether a duty to the public exists; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear unambiguous language. An agreement passing scrutiny under these factors is valid, denying the signing party an action in negligence. The party may still, however, pursue an action for damages caused by willful and wanton misconduct. *Schutkowski*, supra at 1060. See also Comment, *Re-*

leases: *An Added Measure of Protection from Liability*, 39 Baylor L.R. 487, 502–503 (1987).

*Public Duty and Nature of the Service*

█ In Schutkowski, we characterized the type of service or activity that demands a public duty. The service or activity must generally be considered suitable for public regulation and can often be a matter of practical necessity for some members of the public. As a result, the party offering the service or activity, who is favored by the exculpatory language, maintains a superior bargaining position over those seeking the service or participating in the activity. *Schutkowski v. Carey*, supra, at 1060, (citing *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693 (1963)). Additionally, some states will invalidate a release agreement based on disparity of bargaining power between the parties alone. Comment, *Releases: An Added Measure of Protection from Liability*, supra at 493–494.

The agreement in question here involves neither an activity demanding a public duty, nor does it create a severe disparity of bargaining power. Instead, it involves the voluntary activities of David Boehm in a loosely organized, private, unincorporated association. The performances of mock gunfights, while possibly indirectly beneficial to appellees and others in Cody, can hardly be characterized as essential to some members of the public. Appellants also failed to show that David Boehm was at a bargaining disadvantage of any kind when he voluntarily renewed his club membership by signing the 1983 agreement. His role in club leadership strongly suggests the opposite conclusion.

*Fair Contracting*

█ Appellants did not specifically refute appellees' showing that David Boehm entered into the release agreement knowingly and fairly. Mr. Boehm's own deposition testimony was that he read and understood the membership application, including the exculpatory language, before signing it. His roles as Club Secretary and Safety Committee Chairman in 1983, and his membership in 1982, further buttress this conclusion. David Boehm also testified to having personal experience with pistols, rifles, and shotguns and their attendant dangers well before he initially joined the Club. There is no doubt David Boehm entered into the 1983 Club release knowingly and fairly.

*Clear and Unambiguous Language*

█ The final Schutkowski factor requires us to determine whether the release agreement evidences the parties' intent to abrogate negligence liability in clear and unambiguous language. Generally, agreements designed to exculpate parties from negligence liability are disfavored for public policy reasons, and we scrutinize such language closely. In Schutkowski we joined the majority of courts in holding that clear and unambiguous exculpatory language can eliminate negligence liability without expressly stating the word "negligence." *Schutkowski v. Carey*, supra, at 1062; see also Comment, *Releases: An Added Measure of Protection from Liability*, supra, at 489–490.

Based on these standards, we hold that the release agreement in question clearly released Irma and the Chamber from liability for negligence. When David Boehm signed the 1983 Club membership agreement he voluntarily waived any potential negligence claim as follows:

"I [David Boehm] furthermore understand that I shall * * * *hold harmless and release* [the Chamber], its agents and employees, [the Club], its members, and the Irma Hotel, or any other locations sanctioned by the club *from any and all claims and damages* which [David Boehm] *may incur from participating in any and all activities sanctioned by the* [Club]." (Emphasis added.)

This language unambiguously releases both the Chamber and Irma from negligence liability and is similar to the relevant release language we upheld in Schutkowski. *Schutkowski v. Carey*, supra, at 1061–1062. It focuses the signor's atten-

tion on "hold[ing] harmless and releas[ing] * * * any and all claims and damages * * *" that might result from the Club's only sanctioned activity, the mock gunfights. A plain reading of the language in the context of the entire membership application evidences no other rational purpose for which it could have been intended.

Appellants' subargument that this language is rendered ambiguous because it names the "Irma Hotel" instead of "Irma, Inc.," is unpersuasive. Common sense is a prerequisite when interpreting a contract. *Schutkowski v. Carey*, supra, at 1062 (citing *Marathon Oil Company v. Kleppe*, 407 F.Supp. 1301 (D.Wyo.1975), aff'd 556 F.2d 982 (10th Cir.1977)). Whether labeled as "Irma Hotel" or "Irma, Inc.," the release language evidences a plain intent to release the ownership interest in the Irma premises named "Irma."

Appellants have not shown that a genuine issue of material fact exists concerning the enforceability of the release agreement.

### V

We next turn to appellants' challenge that a genuine issue of material fact existed showing that appellees acted willfully or wantonly. Willful and wanton misconduct is not negligence but is a form of intentional misconduct " * * * which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. * * *" *Danculovich v. Brown*, Wyo., 593 P.2d 187, 191 (1979). The intent involved

" * * * is *not* intent to cause injury, but is an intent to do an act, or an intent not to do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another. [Citation.]" (Emphasis added.) *Sinclair Oil Corporation v. Columbia Casualty Company*, Wyo., 682 P.2d 975, 981 (1984) citing *Danculovich v. Brown*, supra at 193.

We affirmed summary judgment on the nonexistence of a genuine issue of material fact regarding willful and wanton misconduct in *Yalowizer v. Husky Oil Company*, Wyo., 629 P.2d 465, 470 (1981).

Appellants contend that appellees had constructive knowledge of the allegedly dangerous character of the blanks being used in 1983, based on two performance accidents occurring before David Boehm's injury. This knowledge is urged as sufficient to create a genuine issue of material fact concerning willful and wanton misconduct. Appellants, however, again fail to show specific facts sufficient to refute appellees prima facie summary judgment showing. Neither of the accidents referenced by appellants were directly related to the alleged *defective character* of the blanks appellants claim caused David Boehm's injury. This leaves appellants solely reliant on David Boehm's personal opinion that a defective blank caused his injury to show willful and wanton misconduct. Opinions and conclusions are insufficient to establish a genuine issue of material fact. *Jones Land & Livestock Co. v. Federal Land Bank of Omaha*, supra. No genuine issue of material fact concerning willful and wanton misconduct existed.

### VI

Finally, appellants argue that an employment relationship existed between the parties and that summary judgment was improperly granted favoring appellees on that issue. The question is relevant because were such a relationship to be found, it would invalidate an otherwise enforceable release agreement under the Wyoming Constitution, Art. 19, § 7. Appellants failed to meet their summary judgment burden on this issue.

We determine the existence of an employment relationship as a matter of law when only one reasonable inference about the existence of the asserted relationship can be drawn from the facts. *Battlefield, Inc. v. Neely*, Wyo., 656 P.2d 1154, 1160 (1983). The controlling inquiry in determining if an employment relationship exists is whether the alleged employer re-

tained the right to control the alleged employee's work. Id., (citing *Combined Insurance Company of America v. Sinclair*, Wyo., 584 P.2d 1034, 1042 (1978)). If the right of control has been exercised, but never retained, an employment relationship does not exist for that reason only. *Battlefield, Inc. v. Neely*, supra, at 1161.

Appellees have shown that neither as a group, nor individually, did they retain the right to control David Boehm's actions in the Club. As previously stated, David Boehm was a voluntary member of the Club and was not paid for his efforts. Appellants' bald assertions that certain appellees either benefited from Club performances indirectly, gave financial aid to the Chamber which was used in part for the Club, or could have directly controlled Club activities,[5] fail to show retention of a right of control evidencing an employment relationship. Appellants' own brief on appeal only argues that these bits and pieces of the record " * * * demonstrate[s] [that] the relationship between David Boehm and the entity appellees *could be viewed* as an employment relationship. * * * " (Emphasis added.) Appellants' obvious uncertainty about their own argument only further convinces us that it rests on thin ice.

Affirmed on all issues.

---

5. For example, appellants urge that an employment relationship existed between David Boehm and the City by arguing:

"There is no doubt that the City of Cody had the power, and indeed, the duty, to control the activities on the City's streets. The City had control over the street maintenance, (R.485.-198) the discharge of firearms, (R.485.24) and had the inherent ability as a governing body to control the actions of the individual gunfighters."

This argument, taken to its logical conclusion, suggests that any person subject to a city ordinance is an employee of the City. This approach oversimplifies the issue and is unacceptable.