FOX, Justice.
*515 [¶ 1] Skylar Dimick was injured when he fell into a septic tank on property owned by Scott Hopkinson. Mr. Dimick and his wife, Jenny Dimick, filed a negligence action against Mr. Hopkinson; his businesses; his family trust; and his wife, Chris Hopkinson; and sought punitive damages for their alleged willful and wanton misconduct. The district court found no issues of material fact and granted summary judgment to all defendants, concluding that Mr. Hopkinson and his businesses were protected by a valid release of liability signed by Mr. Dimick; Mr. Hopkinson committed no willful and wanton acts; Mrs. Hopkinson was neither a proximate cause of Mr. Dimick's injuries nor engaged in a joint venture with Mr. Hopkinson; and the family trust did not exist. We affirm.
ISSUES
[¶ 2] The Dimicks raise five issues on appeal,[1] which we rephrase and reorganize as follows:
1. Did the district court erroneously grant summary judgment to Scott Hopkinson, Mark III, LLC, Mark III Enterprises, LLC, and Fort Bridger Rendezvous Tin Tipi Village by finding that the release exculpated these defendants from liability for negligent conduct, and that Scott Hopkinson's conduct was not willful and wanton?
2. Did the district court erroneously grant summary judgment to Mrs. Hopkinson by concluding that she was not a proximate cause of Skylar Dimick's injuries, and that she was not engaged in a joint venture with Scott Hopkinson?
3. Did the district court erroneously find that there was no admissible evidence to create a genuine issue of material fact that the Hopkinson Family Trust exists?
FACTS
[¶ 3] Fort Bridger Rendezvous (the Rendezvous) is a four-day "mountain man" gathering held each year at the Fort Bridger State Historic Site in Uinta County, where enthusiasts reenact and celebrate the fur-trading era. Mark III Enterprises, LLC,[2] which is solely owned by Mr. Hopkinson, owns a 120-acre working ranch (the Ranch) adjacent to the historic site. During the Rendezvous, Mr. Hopkinson operates a portion of the Ranch as a temporary, for-profit campground for approximately 250-400 attendees known as "Fort Bridger Tin Tipi Village" (Tin Tipi Village). Each year, Mr. Hopkinson clears a hayfield on the Ranch and designates camping areas. Tin Tipi Village provides well water, portable toilets, commercial garbage containers, fire barrels, and firewood, and allows vendors to sell other amenities. Upon entering, campers sign a release of liability, pay a fee, and park their vehicles or campers in designated camping spaces. Mrs. Hopkinson performs various tasks in the office and around the campground.
[¶ 4] The Dimicks, who had been attending the Rendezvous and camping at Tin Tipi Village for over twenty years, arrived at Tin Tipi Village on August 30, 2013. Mr. Dimick signed the "Fort Bridger Rendezvous 2013 Tin Tipi Parking Release & Waiver of Liability" (the Release), paid the entrance fee, parked their pickup and fifth-wheel camper in a campsite, and set up camp with his family. Soon after, Mr. Dimick's father reported that an irrigation ditch between the campsite and the portable toilets was slick to walk across. The previous year, when faced with the same problem, Mr. Dimick had found a wooden pallet on the Ranch property and placed it in the ditch as a dry walking surface. At the end of the Rendezvous, Mr. Dimick had returned the pallet to where he had found it. When his father reported the *516 slick conditions, Mr. Dimick decided to retrieve the same pallet. Mr. Dimick drove his pickup less than a quarter mile on a dirt road into the Ranch property, parked his pickup, and walked about 20 or 30 feet off the road into a rough patch of land located outside the designated camping areas and used by the Ranch as a "work area." Among cut firewood, unused fire barrels, and other debris, he located what he believed to be the same pallet laying flat on a 15-foot, square concrete slab. Mr. Dimick testified:
I picked [the pallet] up with my left hand, kind of stepping in towards it to grab the bottom with my right hand. [I saw] a piece of metal that was underneath it, and didn't think anything was unusual with that. And when I stepped onto the metal, instantly [fell through an opening] into the septic tank and-
....
Suddenly, I don't know where I am, and the pallet come down on top of me and smacked me against the side of the manhole.
[¶ 5] Only a few days earlier, Mr. Hopkinson had hired United Services to empty the septic tank. The United Services agent accessed the tank from an opening at the top of the underground tank (level with the surface of the ground), measuring somewhere between 16- to 24-inches in diameter. The cement cover to the opening was either stuck or too heavy for one person to lift, and Mr. Hopkinson and the agent removed it together. Once removed, the agent informed Mr. Hopkinson that the cover was not safe; if stepped on, it could "swivel" and fall into the tank. After the agent finished cleaning out the tank, Mr. Hopkinson decided he would not reinstall the cover, either because it was faulty or because it was too heavy to put back himself. Instead, Mr. Hopkinson put a piece of sheet metal over the opening to keep out debris and placed a wooden pallet on top of the sheet metal to prevent someone from stepping on the sheet metal and falling into the tank. Once in place, he jumped up and down on the pallet to test its strength.
[¶ 6] Mr. Dimick lifted the same pallet that Mr. Hopkinson had used to cover the opening, stepped on the sheet metal, and fell into the septic tank. As a result of the fall, Mr. Dimick suffered injuries requiring emergency medical treatment and subsequent surgeries. The Dimicks brought negligence claims against the defendants, seeking remuneration for their losses and, due to the defendants' alleged willful and wanton misconduct, punitive damages. Upon the defendants' motions, the district court granted summary judgment to all the defendants on various grounds, discussed in detail below. The Dimicks timely appealed.
STANDARD OF REVIEW
[¶ 7] A district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P. 56(c) (2016).[3]
The party requesting summary judgment bears the initial burden of establishing a prima facie case that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law....
Once a prima facie showing is made, the burden shifts to the party opposing the motion to present evidence showing that there are genuine issues of material fact.
Bogdanski v. Budzik , 2018 WY 7, ¶ 18, 408 P.3d 1156, 1160-61 (Wyo. 2018) (citations omitted). We review a district court's decision to grant summary judgment de novo, without giving deference to the district court's determinations. Stevens v. Anesthesiology Consultants of Cheyenne, LLC , 2018 WY 45, ¶ 24, 415 P.3d 1270, 1279 (Wyo. 2018) (citations omitted). We use the same materials and follow the same standards as the district court. Id. We view the record "from the vantage point most favorable to the party who opposed the motion, and ... give that party the benefit of all favorable inferences that may fairly be drawn from the record."
*517 Id. (citation omitted). "Summary judgments are not favored in negligence actions and are subject to exacting scrutiny," but where there is no genuine issue as to any material fact and the prevailing party is entitled to judgment as a matter of law, the entry of summary judgment is proper. Bogdanski , 2018 WY 7, ¶ 18, 408 P.3d at 1161.
DISCUSSION
I. Did the district court erroneously grant summary judgment to Scott Hopkinson, Mark III, LLC, Mark III Enterprises, LLC, and Fort Bridger Rendezvous Tin Tipi Village by finding that the release exculpated these defendants from liability for negligent conduct, and that Scott Hopkinson's conduct was not willful and wanton?
[¶ 8] A valid release of liability will protect a defendant from a suit in negligence; however, even if valid, a release is unenforceable when the plaintiff's injury resulted from the defendant's willful and wanton misconduct. Boehm v. Cody Country Chamber of Commerce , 748 P.2d 704, 710 (Wyo. 1987). The district court found that the Release was valid and that Mr. Hopkinson's conduct was not willful and wanton, and thus granted summary judgment to the defendants protected by the Release: Mr. Hopkinson, Mark III, LLC, Mark III Enterprises, LLC, and Fort Bridger Rendezvous Tin Tipi Village. The Dimicks challenge the two findings underlying the district court's judgment.[4]
A. Release from Negligence Actions
[¶ 9] To determine whether a release of liability is valid, we consider the following four factors: "(1) whether a duty to the public exists; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear, unambiguous language." Boehm , 748 P.2d at 710 ; Massengill v. S.M.A.R.T. Sports Med. Clinic, P.C. , 996 P.2d 1132, 1136 (Wyo. 2000). "An agreement passing scrutiny under these factors is valid, denying the signing party an action in negligence." Boehm , 748 P.2d at 710. The Dimicks allege that the Release is against public policy, and does not unambiguously release the defendants from claims of negligence.
1. Public Policy
[¶ 10] "Wyoming courts enforce exculpatory clauses releasing parties from liability for injury or damages resulting from negligence if the clause is not contrary to public policy." Schutkowski v. Carey , 725 P.2d 1057, 1059 (Wyo. 1986) (citations omitted). Generally, an exculpatory clause violates public policy if, pursuant to the first three factors of our test, the nature of the service performed involves a duty to the public-that is, an "essential" service-that creates an unfair bargaining advantage to the released party. See Massengill , 996 P.2d at 1136. An essential service is a "service of great importance to the public, which is often a matter of practical necessity for some members of the public." Id. (emphasis in original). Examples of businesses providing essential services include common carriers, hospitals and doctors, public utilities, innkeepers, public warehousemen, employers, and services involving extra-hazardous activities. Id.
[¶ 11] In contrast, we have consistently held that recreation is not an essential service. See , e.g. , Hall v. Perry , 2009 WY 83, ¶ 4, 211 P.3d 489, 490 (Wyo. 2009) (hunting/camping is a nonessential, recreational activity); Milligan v. Big Valley Corp. , 754 P.2d 1063, 1065 (Wyo. 1988) (downhill skiing); Boehm , 748 P.2d at 707 (gun club membership); Schutkowski , 725 P.2d at 1058 (skydiving). Overnight camping at Tin Tipi Village is a recreational activity rather than an essential service of great importance or practical necessity. Mr. Dimick's testimony confirms that the Dimicks camped at Tin Tipi Village for recreational purposes:
Q. [Opposing counsel:] ... what's your purpose for going to the rendezvous and *518 staying on the property that you were injured on?
A. [Mr. Dimick:] Family gathering and to go to the rendezvous and see the different period costumes, shop in some of the traders' tents and so on.
Q. Vacation?
A. Yes.
Q. Recreation?
A. Yes.
It does not violate public policy when a proprietor of a recreational business secures from his customer a release of liability. Milligan , 754 P.2d at 1066 ; Schutkowski , 725 P.2d at 1060. Requiring the Dimicks to sign the Release in exchange for camping at Tin Tipi Village did not violate public policy.
2. Lack of Ambiguity
[¶ 12] The fourth factor for a valid release is that the intention of the parties to eliminate liability for negligent acts be expressed in clear, unambiguous language. Massengill , 996 P.2d at 1135. Because a release is contractual in nature, we apply principles of contract interpretation to discern the parties' intent. See id ."A contract is ambiguous if indefiniteness of expression or double meaning obscures the parties' intent." Fleig v. Estate of Fleig , 2018 WY 30, ¶ 10, 413 P.3d 638, 642 (Wyo. 2018) (citing Whitney Holding Corp. v. Terry , 2012 WY 21, ¶ 41, 270 P.3d 662, 674 (Wyo. 2012) ). Paragraph 2 of the Release states:
2. I recognize that there are certain inherent risks associated with [overnight camping at Tin Tipi Village] and I assume full responsibility for personal injury to myself, minor children, and further release and discharge Mark III LLC for injury, loss or damage arising to myself or my family while in use of, or presence upon the property of Mark III LLC, whether caused by the fault of myself, my family, Mark III LLC owner/employee's [sic], and/or any other third parties.
[¶ 13] The Dimicks contend that ambiguity arises from the Release's language recognizing "certain inherent risks" of overnight camping. We are unpersuaded. When interpreting contractual language, we use our common sense. Hall , 2009 WY 83, ¶ 13, 211 P.3d at 494. "[T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them ... [and] we consider the contract as a whole, giving effect to each provision, if possible." Id. Paragraph 2 of the Release consists of one sentence. In the first clause, the signing party acknowledges that there are certain inherent risks associated with overnight camping at Tin Tipi Village. In the second clause, the signing party releases and discharges Mark III, LLC for injury, loss, or damage suffered by the signing party or his family while on the Ranch, regardless of its cause. A compound sentence containing two ideas does not in itself create an ambiguity. Here, the two provisions are lodged in two distinct clauses, separated by the conjunction "and"-which means to a reasonable person that the second clause is "in addition to" or "as well as" the first. Because the two ideas do not contravene each other, we may give effect to both provisions without producing ambiguity. The Release plainly pertains to all injuries occurring on the Ranch property-not just those caused by inherent risks of camping.
[¶ 14] The Dimicks next argue that the Release does not definitively release the defendants from liability for their negligence because it does not use the term "negligence." We have said that "clear and unambiguous exculpatory language can eliminate negligence liability without expressly stating the word 'negligence.' " Boehm , 748 P.2d at 711 (citing Schutkowski , 725 P.2d at 1062 ). Here, Mr. Dimick released and discharged Mark III, LLC "for injury, loss or damage arising to myself or my family while in use of, or presence upon the property of Mark III LLC, whether caused by the fault of myself, my family, Mark III LLC owner/employee's [sic], and/or any other third parties." (Emphasis added.) At base, the tort of negligence is comprised of an injury caused by the fault of another. There is no material difference between the terms "fault" and "negligence" in the context of the Release. As in Schutkowski , "[i]f it was not the intent of the parties to release appellees from liability for negligent acts, we see little purpose in the Release...." 725 P.2d at 1062.
*519 [¶ 15] Finally, the Dimicks argue that there is a genuine issue of material fact whether the Release contains the entire agreement of the parties. The Dimicks assert that when Mr. Dimick entered the campground and signed the Release, the person collecting fees and signatures at the entrance of the Ranch indicated to him that the property was in the same condition as the previous year (yet, by removing the septic tank cover and placing the pallet over the opening, Mr. Hopkinson had "significantly altered" the condition of the property). The Dimicks appear to contend that the defendants, through their employee, unfairly induced Mr. Dimick into signing the Release by falsely representing to him that property conditions were unchanged.
[¶ 16] The Dimicks rest their contention on Mr. Dimick's testimony:
A. [Mr. Dimick:] They gave us the paperwork to fill out [upon arriving at the campground]. I asked if there were any changes, and they stated, "No," on the rules and regulations. Paid the fee and then went to section H, set up the trailer.
....
Q. [Opposing counsel:] Did you ask anybody about the condition of the property before you went on?
A. Asked if there was [sic] any changes.
Q. Okay. Maybe I misunderstood. I thought that referred to the rules and regulations.
A. Yes. And some of the rules and regulations, there's been droughts to where there was [sic] not fires allowed. Some other times there's been-you have to have your fire out at 10:00 p.m. Things like that that have changed.
Q. So were you asking-were you asking if there were changes to the ranch property, or the rules and regulations? I'm not clear.
A. I would say both.
Q. Okay. And what was their response.
A. It wasn't discussed, other than my asking, "Has anything changed?" and they said, "No."
[¶ 17] Even if the conversation between Mr. Dimick and the unidentified employee were admissible,[5] "[s]peculation, conjecture, the suggestion of a possibility, guesses, or even probability are insufficient to establish an issue of material fact." Bogdanski , 2018 WY 7, ¶ 51, 408 P.3d at 1169 (citations omitted). From the vantage point most favorable to the Dimicks, absent conjecture, one cannot reasonably infer that the employee answering "No" to the question "Has anything changed?" constituted a representation by the defendants that property conditions remained unchanged from 2012 to 2013, upon which Mr. Dimick premised his consent to the Release. We find that the Release was the entire agreement of the parties, did not violate public policy, and plainly expressed the parties' intent to eliminate liability for injuries caused by negligent acts. We thus conclude that the Release is valid and bars the negligence claims.
B. Willful and Wanton Misconduct
[¶ 18] A valid release of liability, however, does not prevent the signing party from bringing an action for damages caused by willful and wanton misconduct.[6] Boehm , 748 P.2d at 710 ; Schutkowski , 725 P.2d at 1059. We have defined willful and wanton misconduct as "the intentional doing, or failing to do, an act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would *520 know that such conduct would, in a high degree of probability, result in harm to another." Cramer v. Powder River Coal, LLC , 2009 WY 45, ¶ 17, 204 P.3d 974, 979 (Wyo. 2009) (citation omitted). Willful and wanton misconduct involves "some element of outrage, similar to that usually found in crime." Id.
[¶ 19] The record shows that Mr. Hopkinson covered the opening with a piece of sheet metal, over which he placed a pallet to keep someone from falling in. He jumped up and down on the pallet to make sure that it would safely hold a person who stepped on it. He did not warn campers about the potential hazard, but the septic tank was in a work site located outside designated camping areas. He did, however, warn the employee who would be responsible for pumping the tank. These facts, if undisputed, establish a prima facie showing that summary judgment should be granted, as they do not demonstrate the type of conduct necessary to establish willful and wanton misconduct. There was not a "high degree of probability" that someone would step into a 16- to 24-inch opening covered by sheet metal and a pallet in a work area outside the designated camping area. And, by placing a pallet over the hole, testing the pallet with his full weight, and warning the employee who was required to come into the area, Mr. Hopkinson manifested an intent to avoid-not a disregard of-the harmful consequences of utilizing a makeshift lid.
[¶ 20] The Dimicks contend that there are genuine issues of material fact as to Mr. Hopkinson's conduct that should be settled by a jury. The Dimicks identify the following facts in the record: Mr. Hopkinson did not replace the septic tank lid because it was too heavy to put back on by himself; Mr. Hopkinson knew or should have known that campers used pallets on the Ranch property for their own use; and Mr. Hopkinson did not mark off the work area or post warning signs. The Dimicks also offer the testimony of their "human factors" expert, Joellen Gill, who stated that Mr. Hopkinson made a "conscious decision" to remove the lid to the septic tank and replace it with sheet metal and a pallet; Mr. Hopkinson's makeshift lid "effectively camouflaged" an open hole; "the hazard was intentionally created by Mr. Hopkinson with his own knowledge"; Mr. Hopkinson's conduct was "reckless"; and Mr. Hopkinson "recognized the hazard yet hid it from anybody who might have occasion to be in that area."
[¶ 21] Accepting Ms. Gill's expert testimony as reliable for the purposes of summary judgment,[7] we must place some of her statements in context. Ms. Gill stated that "the hazard was intentionally created by Mr. Hopkinson with his own knowledge" not to indicate that Mr. Hopkinson intended to do harm. Instead, Ms. Gill was explaining that the hazard was "manmade" rather than an inherent danger of the Ranch property. Ms. Gill's full statement was: "So it's something that's manmade, the hazard was intentionally created by Mr. Hopkinson with his own knowledge." It is undisputed that the hazard was manmade.
[¶ 22] Although Ms. Gill characterized Mr. Hopkinson's actions as "reckless," she stated: "I am not using that language with any kind of legal definition.... [B]y 'reckless,' I mean making decisions without regard for the consequences to other individuals." Ms. Gill's definition of "reckless" falls short of willful and wanton misconduct. In addition to demonstrating that Mr. Hopkinson disregarded the consequences to other individuals, the Dimicks must show that "a reasonable person would know that such conduct would, in a high degree of probability, result in harm to another." Cramer , 2009 WY 45, ¶ 17, 204 P.3d at 979.
[¶ 23] Finally, we are unable to read Ms. Gill's statement that Mr. Hopkinson "recognized the hazard but yet hid it" to mean that Mr. Hopkinson intentionally hid the opening. Although an expert witness may "assist the trier of fact to understand the evidence or to determine a fact in issue," W.R.E. 702, "to establish ... a genuine issue of material fact, [an expert] must provide not only the conclusion, *521 but also the basis for the conclusion." Chapter IV. Economic Evidence and Summary Judgment , 6 Sedona Conf. J. 53, 60 (2005) (citing cases); see also Bogdanski , 2018 WY 7, ¶ 18, 408 P.3d at 1161 (the nonmoving party "must present specific facts; relying on conclusory statements ... will not satisfy" the burden to show a genuine issue of material fact). Ms. Gill cites no specific facts in the record indicating that Mr. Hopkinson intentionally hid the opening. To the contrary, in both her report and testimony, Ms. Gill repeatedly states that Mr. Hopkinson's makeshift lid "effectively camouflaged" the opening and "created a functionally hidden hazard." (Emphasis added.) Ms. Gill asserted that Mr. Hopkinson "failed to recognize [ ] that he created an even greater hazard" by choosing to cover the opening with sheet metal and a pallet. (Emphasis added.)
[¶ 24] Altogether, the facts identified by the Dimicks, given the benefit of all favorable inferences, demonstrate that Mr. Hopkinson: consciously decided not to replace the lid onto the septic tank because it was too heavy to put back himself; failed to recognize that his method of covering the opening effectively camouflaged a hazardous condition; knew or should have known that campers placed pallets across slippery irrigation ditches; and disregarded the consequences to other individuals by creating a functionally hidden hazard-of which he did not warn campers. "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Stevens , 2018 WY 45, ¶ 24, 415 P.3d at 1279 (citation omitted). While these facts, if proven, would bolster a negligence claim, they do not establish the elements of willful and wanton misconduct. There remains no evidence that there existed a "high degree of probability" that a camper would enter the work site located outside the designated camping area, let alone remove the pallet and step directly onto the sheet metal covering the 16- to 24-inch opening. Although Mr. Hopkinson's conduct may have been negligent, there are no facts indicating that his conduct was outrageous, "similar to that usually found in crime." Cramer , 2009 WY 45, ¶ 17, 204 P.3d at 979.
[¶ 25] We conclude that the Dimicks' negligence claims were barred by the Release, and the Dimicks did not present specific facts that would establish willful and wanton misconduct. Mr. Hopkinson, Mark III, LLC, Mark III Enterprises, LLC, and Fort Bridger Rendezvous Tin Tipi Village are entitled to summary judgment as a matter of law.
II. Did the district court erroneously grant summary judgment to Mrs. Hopkinson by concluding that she was not a proximate cause of Skylar Dimick's injuries, and that she was not engaged in a joint venture with Scott Hopkinson?
[¶ 26] Although Mrs. Hopkinson was not protected by the Release, the district court determined that there was no basis to find her liable for Mr. Dimick's injuries. Specifically, the district court found that she was neither a proximate cause of Mr. Dimick's injuries nor engaged in a joint venture with Mr. Hopkinson.[8] The Dimicks challenge both findings.
A. Proximate Cause
[¶ 27] The elements of negligence are well known: "(1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the breach proximately caused injury to the plaintiff; and (4) the injury is compensable by money damages." RB, Jr. by & through Brown v. Big Horn Cty. Sch. Dist. No. 3 , 2017 WY 13, ¶ 13, 388 P.3d 542, 546-47 (Wyo. 2017) (citing Valance v. VI-Doug, Inc. , 2002 WY 113, ¶ 8, 50 P.3d 697, 701 (Wyo. 2002) ). To survive summary judgment, the Dimicks needed to identify genuine issues of fact and principles of law supporting each one of these elements. See Williams v. Plains Tire & Battery Co. , 2017 WY 136, ¶ 17, 405 P.3d 228, 232 (Wyo. 2017).
*522 Here, there is no fact from which a jury could find Mrs. Hopkinson to have proximately caused Mr. Dimick's injuries. She did not participate in placing the sheet metal and pallet over the opening and, in fact, she was unaware that there was a septic tank at that location. Nor was she at the Ranch when Mr. Dimick fell into the septic tank. There are no factual grounds for a direct negligence claim against Mrs. Hopkinson.
B. Joint Venture
[¶ 28] A joint venture or enterprise may be described as "a contractual relationship of mutual agency ... [by] which the negligence of one member ... may be imputed to another." Holliday v. Bannister , 741 P.2d 89, 93 (Wyo. 1987). Thus, if Mrs. Hopkinson had been engaged in a joint venture with Mr. Hopkinson when he serviced the septic tank, his negligence, if proven, may be imputed to Mrs. Hopkinson.
[¶ 29] "The burden of establishing the existence of a joint venture is upon the party asserting that the relationship exists." Popejoy v. Steinle , 820 P.2d 545, 549 (Wyo. 1991) (citations omitted). We apply a four-part test for proving the existence of a joint venture:
(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.
Id. at 549 (citation omitted).
[¶ 30] Here, because it is dispositive, we consider only the fourth element of a joint venture: "an equal right to a voice in the direction of the enterprise." Id. (citation omitted). "Each party to the joint venture must have an 'equal right to direct and govern the movements and conduct of each other with respect thereto. Each must have some voice and right to be heard in its control or management.' " Estate of Hernandez by Hernandez-Wheeler v. Flavio , 187 Ariz. 506, 930 P.2d 1309, 1312 (1997) (citation omitted); see also Lightner v. Frank , 240 Kan. 21, 727 P.2d 430, 433 (1986) (in the context of vehicle operation, "[t]here must be equal responsibility ... and there can be no equal responsibility unless there is equal privilege and right to direct and control its operations."). "[E]qual actual control is not necessary, ... equal right to control is 'necessary' and 'key.' " Washington Inv. Partners of Delaware, LLC v. Sec. House , 28 A.3d 566, 578 (D.C. 2011) (emphasis in original).
[¶ 31] "The sine qua non of the relationship is a contract, whether it be express or implied." Holliday , 741 P.2d at 93 (citation omitted). Thus, "there [must be] an understanding between the parties that [each] has the right and is possessed of equal authority...." Lightner , 727 P.2d at 433 (emphasis in original); see also Carlson , 199 So.3d at 743 (coventurers must have "an understanding that they are to share in profits or losses and ... have a voice in its management" (emphasis added) ); Estate of Hernandez , 930 P.2d at 1312 ("[T ]he agreement must indicate that 'each of the parties to such joint adventure has authority to act for all....' " (citation omitted) (emphasis added) ). In short, to establish equal right of control, the proponent must prove that the parties agreed, either expressly or impliedly, that each possesses a privilege to control the venture.
[¶ 32] It is undisputed that Mr. Hopkinson purchased the Ranch in 1999, and ran the for-profit campground, a business venture, for many years on his own. Mrs. Hopkinson first began "helping" her husband in 2011, two years before Mr. Dimick's fall. Mrs. Hopkinson testified that she did "office things," such as typing up the Release, making and setting up signs, and putting up the tent they use as an office. She also greeted campers as they entered the campground, answered questions, and collected garbage from campsites. She would do "whatever [Mr. Hopkinson] tells me he needs me to do for him.... Whatever I am told to do, I do." This testimony establishes a prima facie showing that her agreement to participate in the venture did not include an equal right of control.
[¶ 33] The Dimicks counter that the Tin Tipi Village website evidences a genuine issue *523 of material fact as to Mrs. Hopkinson's equal right of control. Specifically, they cite Mrs. Hopkinson's testimony that the contact number listed on the Tin Tipi Village website is Mrs. Hopkinson's personal cell phone number. Additionally, the Dimicks argue, the Hopkinsons use the pronouns "we" and "us" on the website. For example, the website states: "Help us help you!"; "We want to be able to supply you with water during the week if you run low"; and "We appreciate those of you who bring in your own fire barrels, but if you don't have a fire barrel and need to rent one from us, you can do that at the registration tent." One cannot reasonably infer from these facts an agreement between Mr. and Mrs. Hopkinson, express or implied, that each "has the right and is possessed of equal authority" to direct the business. Lightner , 727 P.2d at 433 (citation omitted). As to proving a joint venture between spouses, we have recognized that "vicarious liability might attach to a non-negligent spouse engaged in a family-owned business venture." Popejoy , 820 P.2d at 552. But, as one court observed, "[i]n one sense, husbands and wives in their journey through life are always engaged in joint enterprises...." Brubaker v. Iowa Cty. , 174 Wis. 574, 183 N.W. 690, 692 (1921). Thus,
[t]he marital relation between husband and wife does not by itself give rise to a partnership affecting their mutual rights and obligations or their relationship to third persons. Nor does the mere fact that a wife participates in the conduct of a business with her husband necessarily establish a partnership between them unless there exists some other indicia of partnership, and the intent to form a partnership is clearly proved.
59A Am. Jur. 2d Partnership § 201 (May 2018 update) (citing cases); see also , e.g. , Klaber v. Klaber , 133 So.2d 98, 99 (Fla. Dist. Ct. App. 1961) (finding no joint venture where the wife actively and substantially assisted the husband in the operation of a general merchandise store); Valley Sav. Bank v. Staves , 224 Iowa 1197, 278 N.W. 346, 346-47 (1938) (no joint venture where husband attended to all details incidental to realizing incomes from wife's inherited properties, including the making of leases, fixing their terms, collecting rent, and paying taxes); Carlson v. Brabham , 199 So.3d 735, 742-43 (Miss. Ct. App. 2016), reh'g denied (June 21, 2016), cert. denied , 203 So.3d 597 (2016) (wife who did all the bookkeeping and finances for husband's business, and hired her friend as an employee, was not a coventurer). Because the Dimicks do not meet the fourth element-presenting evidence of the existence of an equal right of control-we need not consider the other elements to conclude that Mrs. Hopkinson was not engaged in a joint venture with Mr. Hopkinson. In the absence of facts upon which a jury could find Mrs. Hopkinson to be either a proximate cause of Mr. Dimick's injuries or a coventurer with Mr. Hopkinson, Mrs. Hopkinson is entitled to summary judgment as a matter of law.
III. Did the district court erroneously find that there was no admissible evidence to create a genuine issue of material fact that the Hopkinson Family Trust exists?
[¶ 34] The Dimicks named the "Hopkinson Family Trust" as a defendant. The only evidence of the trust's existence is that the name of the trust appears on a form titled "Fort Bridger Rendezvous Association PRE Registration Form" for "Tin/Tipi Village" (the Registration Form). The Registration Form lists Fort Bridger Rendezvous Association's address as a post office box in Woodruff, Utah. Below the registration information, there is a release of liability, which states: "I/We hereby release Scott Hopkinson, the Hopkinson Family Trust, Mark III Enterprises, LLC, the Fort Bridger Rendezvous Association, their officers, associates, successors in interest" from liability resulting from activities on "the Hopkinson Property." The Registration Form (and the release of liability contained within it) is not the Release that Mr. Dimick signed, and the Dimicks offered it only to demonstrate the existence of the Hopkinson Family Trust.
[¶ 35] Mrs. Hopkinson testified that she and Mr. Hopkinson did not have a trust, and she had no knowledge of the Registration Form:
*524 Q. [Dimicks' counsel:] So up until two weeks ago you had never seen [the Registration Form]?
A. [Mrs. Hopkinson:] No.... That's not ours. That must be the Rendezvous Association's that handled it for years. It's Woodruff, Utah.
....
Q. So I guess you had never seen this prior to two weeks ago?
A. Nope.
Q. Do you know what year this was in use?
A. I have no idea.
....
Q. ... [C]an you help us understand then why the Hopkinson Family Trust is named?
A. I have no idea because we do not have a Hopkinson Family Trust. If there is one, I'd like to know if I'm in it. That would be great.
....
Q. ... [Y]ou don't know who made this release?
A. I have no idea. It said Woodruff, Utah. It said Woodruff, Utah.... I know no one in Woodruff, Utah. Most likely it's the secretary for the Fort Bridger Rendezvous Association.... They have a registration over on the fort. This is theirs apparently.
....
Q. ... [Y]ou believe that the Woodruff address is the address of the Fort Bridger Rendezvous Association?
A. I have no idea.... It's not my address.
Q. You have never lived in Woodruff?
A. I have never lived in Woodruff.
[¶ 36] "Evidence opposing a prima facie case for summary judgment must be competent and admissible." Williams v. Matheny , 2017 WY 85, ¶ 12, 398 P.3d 521, 526 (Wyo. 2017). The Dimicks' sole piece of evidence upon which they claim a genuine issue of material fact-the Registration Form-would not be admissible at trial. The record does not indicate who created the form, where or by whom it was discovered, or any other information establishing that the Registration Form is what the Dimicks purport it to be. See W.R.E. 901. Even if it were authenticated, without more evidence, any conclusions derived from the Registration Form are purely speculative. See Bogdanski , 2018 WY 7, ¶ 18, 408 P.3d at 1160. Absent admissible, specific facts showing a genuine issue of material fact, we conclude that the Hopkinson Family Trust is a non-entity and summary judgment is proper as a matter of law.
CONCLUSION
[¶ 37] There are no genuine issues of material fact as to the issues on appeal. As a matter of law, Mr. Hopkinson, Mark III, LLC, Mark III Enterprises, LLC, and Fort Bridger Rendezvous Tin Tipi Village are protected from the Dimicks' negligence claim by the Release; Mr. Hopkinson committed no willful and wanton acts; Mrs. Hopkinson was neither a proximate cause of Mr. Dimick's injuries nor engaged in a joint venture with Mr. Hopkinson; and there is no admissible evidence to create a genuine issue of material fact that the Hopkinson Family Trust exists. We affirm the district court's entry of summary judgment as to all defendants.

The district court found genuine issues of material fact as to whether the defendants were protected by the Wyoming Recreational Safety Act and whether Mr. Dimick was a trespasser. Because we affirm summary judgment on other grounds, we do not consider these issues.

Defendant/Appellee, "Mark III, LLC," is an abbreviation for Mark III Enterprises.

This rule was amended in 2017, and the quoted language now appears at W.R.C.P. 56(a).

The Dimicks do not dispute the district court's identification of Mr. Hopkinson, Mark III, LLC, Mark III Enterprises, LLC, and Fort Bridger Rendezvous Tin Tipi Village as the parties protected by the Release.

"The parol evidence rule generally states that the intent of the parties to a contract or instrument is to be determined solely from the language of the instrument and extrinsic evidence may be examined only when the language is ambiguous." Belden v. Thorkildsen , 2007 WY 68, ¶ 16, 156 P.3d 320, 324 (Wyo. 2007). "However, we depart from the parol evidence rule if the evidence is used to establish a separate and distinct contract, a condition precedent, fraud, mistake, or repudiation." Id. The Dimicks appear to argue that the employee misrepresented to Mr. Dimick the condition of the Ranch property.

Willful and wanton misconduct does not create a separate cause of action but, rather, constitutes one basis for recovering punitive damages. Vance v. Wyomed Lab., Inc. , 2016 WY 61, ¶ 15, 375 P.3d 746, 749 (Wyo. 2016).

The defendants did not file a motion to exclude Ms. Gill's testimony. See , e.g. , Bunting v. Jamieson , 984 P.2d 467, 470 (Wyo. 1999).

The district court also found that Mrs. Hopkinson is not an owner of the Ranch property. The Dimicks do not contest this finding.