Kris L. HOLLIDAY, Administrator and Personal Representative of the Estate of Lance Lanum, and on behalf of Marcia Lanum, Larry Lanum, Michael Lanum and Elizabeth Lanum Wells, Appellant (Plaintiff),

v.

Gene E. BANNISTER, Appellee (Defendant),

Steven R. Bannister, (Defendant).

No. 86–235.

Supreme Court of Wyoming.

Aug. 3, 1987.

C. Bradley Smith, II, of Simonton & Simonton, Cody, for appellant.

Robert M. Shivley of Murane & Bostwick, Casper, for appellee.

Before BROWN, C.J., THOMAS, CARDINE and URBIGKIT, JJ., and RAPER, Ret. J.

RAPER, Retired Justice.

This appeal arises as a result of a summary judgment for appellee granted by the district judge in a wrongful death action prompted by a hunting accident.

Appellant views the issues to be:

1. "Did the district court err in granting defendant/appellee's motion for summary judgment where the court was of the opinion that if the court went to trial with what was before it at the summary judgment hearing, the court would direct

a verdict for defendant/appellee on the issues that have been raised?"

2. "Did the district court err in holding that there was no genuine issue of material fact as to the existence of a joint enterprise between Gene Bannister and Steven Bannister, there being shown no direction or control, so as to support the imputation of the negligence of one of the members of the enterprise to the other?"

3. "Did the district court err in holding that there was no genuine issue of material fact as to the existence of an agency or master/servant relationship between Gene Bannister and Steven Bannister, there being shown no direction or control, so as to support the imputation of the negligence of the agent/servant to the principal/master?"

Appellee sees the issues as:

"1. Whether in granting the Motion for Summary Judgment the trial court applied the correct standard upon which to base its ruling of Summary Judgment in favor of this Appellee?

"2. Whether the Appellant, at the time of the hearing on Appellee's Motion for Summary Judgment, raised any genuine issue of material fact to the trial court about the existence of a joint enterprise as between Appellee Gene E. Bannister and his son, Steven R. Bannister?

"3. Whether, at the time of the hearing on Appellee's Motion for Summary Judgment, the Appellant raised any genuine issue of material fact about the existence of an employer-employee or master-servant relationship as between Appellee Gene E. Bannister and his son, Steven R. Bannister?"

The issues boil down to whether the appellee can be held, as a matter of law, vicariously liable for the negligence of his son, Steven Bannister, under the facts of this case about which there is no genuine issue.

We will agree with the district judge that summary judgment was proper and affirm.

Following the hearing before the district court, the district judge entered an order in pertinent part as follows:

"3. That based upon the record currently before the Court, there was on September 6, 1983, no master-servant relationship as between Gene E. Bannister and Steven R. Bannister, there being shown no direction or control, and that therefore there is no vicarious liability on the part of Gene E. Bannister for any negligence as may be found against the Defendant Steven R. Bannister in the captioned action;

"4. That on or before September 6, 1983 there was no joint venture or joint enterprise as between the Defendants Gene E. Bannister and Steven R. Bannister, there being shown no direction or control[;]

"5. That while the Court realizes that whether or not there is evidence of negligence is traditionally a question for a jury, the Court finds that reasonable men could not differ in their conclusion that any violation of statute by Gene E. Bannister as alleged by the plaintiff was not the proximate cause of the death of Lance Lanum; there appearing in the record to be an efficient intervening cause and that as a matter of law, and in accord with *Hall v. Booth*, 423 [So.2d] 184 (Ala.1982), the plaintiffs have failed to show that any violation of the statute by Defendant Gene E. Bannister was a proximate cause of the death of Lance Lanum or that the death of Lance Lanum was foreseeable by the Defendant Gene E. Bannister[.]"

When reviewing a summary judgment, the Supreme Court has the same duty, reviewing the same material and analyzing the same standards, as the district court. *Wyoming Recreation Commission v. Hagar*, Wyo., 711 P.2d 402 (1985). We therefore have the duty of examining the entire record before determining whether the summary judgment was appropriate and "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), W.R.C.P. In going through this exercise, we must look at the record from a vantage point most favorable to the party opposing the motion for summary judgment, giving him every favorable inference

which may be drawn from the depositions, affidavits and other material properly submitted in the record. *Olson v. A.H. Robins Company, Inc.*, Wyo., 696 P.2d 1294 (1985).

The record before the trial court and now this Court discloses that appellee and his son, Steven, in the fall of 1983, were experienced hunters and had hunted together some 30 or 40 times. It was appellee who had taught Steven how to hunt and the fundamentals of firearms and hunting safety from the time Steven was a child. Appellee considered himself to be very close to his son, Steven. Each knew the hunting abilities of the other.

The material in the file shows appellee to be a very experienced hunter. He had previously drawn three Wyoming big horn sheep permits and had bagged two sheep. He had guided other hunters in Wyoming. He had seen and recognized "buck fever" in other hunters but had never seen it in his son, Steven, whom he considered to be an excellent shooter. There is no evidence that Steven had ever before been involved in a hunting accident of any kind.

The area in which they were hunting was not strange to them. Steven had hunted there before with his father, appellee, his wife or with a family friend, Roy Coleman, six or seven times.

The depositions and other material gave no reason for appellee to expect that his son would accidentally shoot another hunter. Steven was a responsible adult, 25 years of age at the time and a high school graduate. Steven had never before been charged with a crime other than speeding citations and had no game and fish violations.

Steven Bannister, during and after graduation from high school, worked in a hardware store owned by his father and there sold firearms. Thereafter, he worked in a sporting goods store where he also sold hunting, fishing and camping equipment including firearms. He considered himself knowledgeable about firearms and their uses, had done some reloading of shotgun shells, had read reloading manuals for rifles and had owned several firearms, including a 30–06 rifle. He sighted in the magnum 300 Weatherby rifle which he borrowed from his father and advised his father of the fact that he had sighted in the firearm. Steven liked that firearm because of its additional range. Appellee did not use that particular rifle much because of its heavy "kick" when fired and preferred the 30–06 he took along.

Appellee believes he received notice sometime in July or August 1983 that he had drawn a sheep permit. While he did not specifically recollect, he testified that he believed he probably called his son, Steven, and advised him he had received a sheep permit. He also testified that he believed he had also called his other sons and asked if they too wanted to go on the hunting trip. Appellee made arrangements to hire horses through a Park County guide and outfitter, Doug Blevins. Before leaving, appellee and Steven each borrowed and bought things they would need for that trip.

As was the custom in the Bannister family, costs were to be shared on a roughly equal basis. To the extent possible, the expenses were shared. When the groceries were purchased, each paid a half of the cost. Because of the circumstances which occurred, appellee never asked for reimbursement from his son for fuel, guide and outfitter expenses he had paid.

Only appellee had a license to hunt big horn sheep. Steven had a license to hunt bear. According to appellee, it was customary to take more than one rifle on a hunt. It was planned that, in addition to hunting bear, Steven would provide the backup rifle for appellee's sheep hunting. Appellee testified that it was his plan to actually shoot the sheep and Steven would shoot if the sheep was only wounded. There was no prior decision that whoever sighted the sheep first would shoot it, nor any discussion about who would take what gun and for what purpose.

Steven testified that he originally did not intend to shoot a sheep and did not decide to do so until he actually started shooting at some that were sighted on the date of the incident, September 6, 1983. There

was no discussion before the trip that Steven would be the one initially shooting at sheep. Appellee's testimony was that it was clear in his mind that it was understood that, if a big horn sheep was sighted, he would take the first shot.

Appellee and Steven, after being taken to their hunting camp, for three days hunted unsuccessfully, primarily for sheep but also for bear. They remained in camp the fourth day and again hunted on the fifth day, and again saw neither sheep nor bear.

On the evening of the fifth day, appellant's decedent, Lance Lanum, and another customer of the outfitter, Doug Blevins, appeared in the Bannister camp. The hunter with Lance went on down the mountain, Lance remained in the Bannister camp that evening. He had mentioned that he had seen sheep in the "Cabin Creek" area and that in the morning he would try to show the Bannisters where they were. They left camp the next morning. They came to an outcropping on a ridge later where, at the suggestion of Lance, appellee would remain with a spotting scope to spot for the sheep seen earlier. Lance also carried a rifle and had a license to hunt sheep. It was appellee's hope that, by the movements of Lance and Steven, they would spook the sheep his way so he could get a shot.

After Lance and Steven left, they lost track of the sheep, so Lance returned to the outcropping to see where the sheep had gone. Lance and Steven thereafter continued up a ridge and again spotted a sheep, at which Steven fired but missed. They continued into a basin where they hunted until about noon. Because Lance was to meet someone else, they began walking towards where they had left appellee. On their return, they spotted two rams so decided to stalk them. In doing so, Lance went on up a rock slide to Steven's right. Lance spotted sheep to the right of both. Steven fired a shot, and the sheep turned and headed back to his left. Apparently, when Steven fired again, Lance was in the line of fire and was struck by the bullet and killed.

Appellee had remained at the outcropping and did not see either the earlier shooting or the accident. Steven was fined for hunting sheep without a license. No criminal charges were initiated against appellee nor further criminal charges against Steven.

As noted during the oral argument to the district judge by appellant's counsel, appellant had only the depositions of appellee and his son, Steven, as his evidence. That did not relieve appellant of his burden. A settlement was reached between Steven and appellant, and the suit was dismissed as to Steven.

Appellant, during oral argument to the district judge, abandoned any claim of negligent entrustment against appellee.

## I

■ Appellant complains that, when the trial court orally decided the motion, it declared that if the case went to trial on the basis of what was before the court at the time argued, it would not permit it to go to the jury and would direct a verdict for Gene Bannister, appellee here. We find no error in the court making such a statement. This Court, in *Cordova v. Gosar*, Wyo., 719 P.2d 625, 634 (1986), quoting *Wood v. Trenchard*, Wyo., 550 P.2d 490, 492 (1976), stated:

> " ' "However, if the movant makes out a prima facie case that would entitle him to a directed verdict if uncontroverted at trial, summary judgment will be granted unless the party opposing the motion offers some competent evidence that could be presented at trial showing that there is a genuine issue as to a material fact. One commentator explains this process as follows: 'the burden of producing evidence is shifted to the party opposing the motion[.]' * * * " 10 Wright and Miller, Federal Practice and Procedure, § 2727, pp. 536–537 (1973).' "

This Court decided *Wood v. Trenchard* applying this standard to resolve a summary judgment appeal using the same material as was available to the trial judge. We cannot find error in the use of such standard.

## II

Appellant next asserts that there is a genuine issue of fact as to the existence of a joint enterprise as between appellee and his son, Steven.

It was stated in *Endresen v. Allen*, Wyo., 574 P.2d 1219, 1226 (1978), that:

> "It has been said that the necessary elements [of a joint enterprise] are (1) an agreement, express or implied; (2) a common purpose; (3) community of pecuniary interest; and (4) an equal right to a voice in control and direction of the enterprise."[1]

■ Paraphrasing what follows in *Endresen v. Allen*, an enterprise is not a status created by law but is a contractual relationship of mutual agency employed to represent a unity between persons in pursuit of a common purpose, as a result of which the negligence of one member of the unity may be imputed to another.

A case comprehensively dealing with joint enterprise, which Prosser & Keeton Torts 5th Ed. HBLE (1984) notes at page 518 is frequently quoted, is *Carboneau v. Peterson*, 1 Wash.2d 347, 95 P.2d 1043, 1054 (1939):

> "Briefly stated, a joint adventure arises out of, and must have its origin in, a contract, express or implied, in which the parties thereto agree to enter into an undertaking in the performance of which they have a common purpose and in the objects or purposes of which they have a community of interest, and, further, a contract in which each of the parties has an equal right to a voice in the manner of its performance and an equal right of control over the agencies used in the performance. Thus, we note (1) a contract, (2) a common purpose, (3) a community of interest, (4) equal right to a voice, accompanied by an equal right of control.
>
> "The sine qua non of the relationship is a contract, whether it be express or implied. As a legal concept, a joint adventure is not a status created or imposed by law, but is a relationship voluntarily assumed and rising wholly ex contractu. The essence of a contract is that it binds the parties who enter into it, and, when made, obligates them to perform it, and failure of any of them to perform constitutes, in law, breach of contract. *A mere agreement, or concord of minds, to accompany one another upon an excursion, but without an intent to enter into mutually binding obligations, is not sufficient to create the relationship of joint adventure.*
>
> \* \* \* \* \* \*
>
> "However, even if it can be said that there is a common purpose, yet if it is merely for social companionship, no joint adventure arises, since persons engaging in such an undertaking do not intend to enter into mutually binding and enforceable covenants.
>
> \* \* \* \* \* \*
>
> "The petty contribution toward the purchase of gasoline was not of itself sufficient to elevate an informal arrangement into the dignity of a contract. While an agreement to share expenses of an excursion is of evidentiary value in determining whether there was in fact and in law a contract, it is not controlling of the question, and, in many instances, amounts to nothing more than a gesture of good will or social companionship." (Emphasis added.)

While at one time in the law vicarious liability founded on joint enterprise was based on association alone, the doctrine has

---

**1.** *Endresen v. Allen*'s statement of the elements of a joint enterprise appears to be a chopped version of the elements as stated by the Restatement (Second) of Torts § 491 comment c at 548 (1977), where they are stated to be:

> "The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. Whether these elements exist is frequently a question for the jury, under proper direction from the court."

We refer to the Restatement (Second) of Torts in that it is a bit more clear and explanatory.

been condemned because it is seldom that some element of common purpose cannot be found. This concept is now almost entirely discredited and according to Prosser & Keeton Torts, supra at 519:

> "[i]t is now agreed that something more is required for a joint enterprise than the mere showing of a contract or agreement to travel together to a destination for a common purpose. Something in the nature of a common business, financial or pecuniary interest in the objective of the journey is now generally held to be essential. Recent decisions have thus refused to find a joint enterprise where the parties are casually together for pleasure or for independent ends." (Footnotes omitted.)

While most of the cases involved the operation of motor vehicles, we see no reason why there should be any different rules with respect to other activities and instrumentalities.

In *Easter v. McNabb*, 97 Idaho 180, 541 P.2d 604 (1975), the Idaho Supreme Court concluded that, by limiting the doctrine of joint enterprise to those having a business or pecuniary purpose, it avoided the imposition of a basically commercial concept, derived from the law of partnership and principles of agency, to non-commercial situations which are more often matters of friendly or family cooperation and accommodation. The court therefore affirmed a summary judgment of the trial court in a case involving a fishing trip and refused to impute negligence to other members of the fishing party not charged with negligence, holding that as a matter of law no joint enterprise existed.

In *Hall v. Blackham*, 18 Utah 2d 164, 417 P.2d 664 (1966), it is stated that, in a case involving duck hunters if the court were to conclude that there was a joint venture, the doctrine of joint enterprise would be applied to situations which were merely matters of friendly or social cooperation and accommodation where the reason for placing liability is not the same as if they were engaged in business or a commercial venture.

*Edlebeck v. Hooten*, 20 Wis.2d 83, 121 N.W.2d 240 (1963), also stands for the proposition that the concept of joint adventure or enterprise is to be confined to business enterprises for purposes of imputation of negligence and was inapplicable to a deer hunting trip for pleasure or sport even though there was a sharing of the game and expenses.

We are convinced by the foregoing line of authority that the pecuniary, commercial and business aspects of a joint enterprise are the missing elements necessary to create vicarious liability in the appellee. Appellee and his son were merely on a father-son outing to hunt which had been their pleasure on a number of previous occasions. That they shared the expense of the trip is of little consequence as noted by the law which we have enunciated. There was absent the contract, a profit motive and equal right of control found in and required by the business relationship of a joint enterprise.[2] Any attempt to warp such a relationship to fit a social event would be unbecoming of the law.

### III

Appellant next questions the district court's holding that there was no genuine

---

**2.** The appellant belatedly attempted to inject a pecuniary fact or motive of the hunt by presenting affidavits of two additional witnesses. One, the affidavit of the director of administration of the Foundation for North American Wild Sheep, stated that, because of the limited availability of sheep hunting licenses, the Foundation had solicited from various state governors licenses which were auctioned at its annual convention for the purpose of raising money for the charitable work of the Foundation. Since 1981, the licenses had been sold for $29,000 to $52,000. The other affidavit from a taxidermist stated that an "unremarkable" head mount in 1983 had a fair market value of $900.00 but the value could range as high as $4,500 for a full life-size mount. Appellee responded with his affidavit stating that he had no intention of trying to sell his license even if he could have and that any profit motive was never discussed with his son. His intention was to have the head and horns mounted and thereafter placed at his Black Hills cabin for his own admiration and that of his friends and family. The trial judge held these affidavits were filed late pursuant to Rule 56(e), W.R.C.P., and were not considered by the court as admissible evidence. The court's ruling has not been raised as an issue on appeal.

issue of material fact as to a master-servant relationship between appellee and his son, Steven, so as to impute negligence to appellee as the principal master in that there was no showing of direction or control.

■ The prime consideration is to determine whether or not an agency has been created. Agency is a fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent. There is no presumption that an agency exists. *True v. Hi-Plains Elevator Machinery, Inc.*, Wyo., 577 P.2d 991 (1978). In Wyoming, the overriding element in determining whether one is an employee or an independent contractor is dependent on whether the employer has a right to control the details of the work whereby liability is sought to be established. *Noonan v. Texaco Inc.*, Wyo., 713 P.2d 160 (1986) (in which this Court sustained a summary judgment as against the claims of plaintiff's deceased). This Court went on to say that the issue becomes one of law when only one reasonable inference can be drawn. That latter standard was similarly observed by the trial judge, and from the material before us, we find the required element of control to be a material fact which is not shown.

By way of further precedent, a most applicable case is *Nicholas v. Moore*, Alaska, 570 P.2d 174 (1977), a moose hunting situation in which the plaintiff claimed that one hunter of a hunting duo was vicariously liable for the negligent acts of his co-hunter. The defendants, Moore and Czuba, went to Alaska to hunt game. They went in Moore's truck with no explicit agreement with respect to expenses; the division of expenses took place in an informal fashion. The purpose of the hunt was for trophies, with the gathering of meat a secondary consideration. They had an unwritten "gentlemen's agreement" that each hunter was entitled to keep for himself any game he mortally shot.

They were hunting moose when one was spotted. Moore got out of the truck, shot and hit the animal. It was wounded and disappeared into the brush. The defendants attempted to track the animal with Czuba following the tracks and Moore circling to outflank it. Moore was lucky and fired other shots, killing the moose. Czuba, at that point several hundred yards from Moore, shot at a movement in the brush which he thought to be the moose. Instead, Czuba's shot struck the plaintiff, causing severe injuries.

The Alaska court cited Restatement, Second, Agency, § 220(2) (1958), with respect to the right to and the necessity for control by the person alleged to be the master over the alleged servant which we have already indicated to be a primary test. The Alaska court goes on to point out further from comment h three factors pertinent to the question of control: (1) the understanding of the community that persons doing such work are servants, (2) the supplying of tools by the employer, and (3) the belief of the parties that a master-servant relationship exists. In *Nicholas v. Moore*, the court found none of those factors were present. There was no evidence of community understanding—Czuba had his own rifle and had complete control as to when and how to use it. The decision as to who was to track the wounded moose and who was to outflank it was mutual, and Moore did not feel he was in a decision-making position as to Czuba.

■ We find the Alaska case to be much the same as the one before us. There is no evidence here of a custom in hunting to create a master-servant hierarchy of control under the circumstances of this case. There is no question but that Steven had anything other than complete control as to when and how to use the rifle. An insignificant difference is that Czuba was using his own rifle whereas Steven was using one owned by appellee, but it will be recalled that this was Steven's choice because he preferred it. He had his own rifle but had taken the Weatherby because if its additional range. We find nowhere in the record any belief that Steven was his father's servant on the trip.

In passing, we note that *Nicholas v. Moore* also held that there was no joint

venture or enterprise involved in the hunt on much the same basis as we hold, as well as upon the element of control. We would have to strain to reach the unnatural result sought by appellant.

We completely agree with the trial judge that the summary judgment for appellee was proper.

Affirmed.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Justice, dissenting.

In violation of Wyoming hunting statutes, a father with a mountain-sheep permit sent his (unlicensed) son up a mountain to shoot a trophy big horn sheep. Instead of the desired wild animal, the son negligently shot the guide, killing him instantly. Denying the wrongful-death claim by summary judgment, and absolving the father from liability for instigating, organizing, and directing this lethal activity occasions a result by this court from which I dissent.

I directly differ with the court's resolution of appellant's third issue that no agency between father and son could be inferred from the facts. Had both father and son possessed separate hunting licenses for the trophy mountain sheep, I would accept, under the same situation, that responsibility for the negligence of the son might not be attributed to the father. Between the two, only the father held a license. This is important to the factual status that the son was following the direction of the father. Such an inference, if not better a realistic conclusion, is reasonable from the affidavits of the father and son. The presence of control and any degree of control exercised by the father is a material fact to the judgment of law given in this case. I do not say it is unreasonable to infer no agency existed, but merely that it is reasonable to infer an agency may have existed. Two reasonable inferences arising from relevant facts create a genuine issue of material fact making summary judgment inappropriate. *Cordova v. Gosar*, Wyo., 719 P.2d 625, 639 (1986).

I agree with the majority that the facts are not in dispute. However, my perception from those facts differs radically from the vision of this court. The court sees a father-son hunting trip with both involved and benefited equally. I see a trophy hunt where the father, with the only sheep hunting license, dispatches the son as an agent to acquire the desired prize—a specifically anticipated benefit. The father provided the incentive for the hunt, the gun for the son, and the funds for the trip.

The father drew a highly valued and difficult-to-obtain big horn mountain sheep permit through the Wyoming Game and Fish Commission's lottery. He instigated and funded the trip in response to his good fortune. The record reflects that the activity was controlled by his supervisory-parental influence.

Decedent came to guide the two to where he had recently seen sheep. The three horsebacked up the mountain until rough terrain forced them to continue by foot. When they reached a rock outcropping, they spotted sheep on a distant rock slide. The father decided to remain where he was because of the difficult terrain yet to be crossed to reach the sheep. The son and guide continued the pursuit for the father. With a rifle provided by his father, the son made three series of shots while attempting a kill. Sadly, in the third series, the guide, whose personal representative is the appellant, was negligently and fatally shot. The guide was negligently killed during this trophy hunt with the father and son criminally violating a hunting statute because only the father had a sheep license. Motivating this violation was the father's desire to acquire a trophy for his mountain cabin. The father had sent forth his agent which resulted in the death of another.[1]

---

1. The conduct of the father in this case in a negligence liability context involving civil liability is not essentially different from the accessory murder cases in a criminal liability context where attributable death penalty criminal liability is created in current jurisprudence. *Hopkinson v. State*, Wyo., 709 P.2d 406, cert. denied — U.S. ——, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985); *Hopkinson v. State*, Wyo., 708 P.2d 46 (1985); *Hopkinson v. State*, Wyo., 704 P.2d 1323 (1985);

The majority rely on *Noonan v. Texaco, Inc.,* Wyo., 713 P.2d 160, 164 (1986) to answer appellant's third issue in the negative. Noonan, supra, provides the analysis to distinguish an employee from an independent contractor, where independent-contractor status bars imposition of liability to the employer. To say Noonan, supra, disposes of appellant's argument is to say no agency status can exist beyond the employer-employee relation. Such a notion is false and seriously misleads those who rely on this court's wisdom.

Obviously, the employee relationship is not the only kind of agency which can be created. This is spelled out in the majority's premiere case. "[O]ne may become an agent by voluntarily performing a gratuitous service for another." *Nicholas v. Moore,* Alaska, 570 P.2d 174, 176 (1977). This is true even where the parties involved fail to recognize they have manifested an agency relation. " '[T]he relation may be held to exist, notwithstanding a denial by the alleged principal, and whether or not the parties understood it to be an agency.' " *True v. Hi-Plains Elevator Machinery, Inc.,* Wyo., 577 P.2d 991, 998 (1978), quoting from 2A C.J.S. Agency § 52, 623–625. These cases reflect the position taken in Restatement of the Law Second, Agency 2d § 1, p. 8 (1958):

> " * * * Thus, when one who asks a friend to do a slight service for him, such as return for credit goods recently purchased from a store, neither one may have any realization that they are creating an agency relation or be aware of the legal obligation which would result from performance of the service."

Such an agency would not be an employer-employee situation and yet an agency may be implied.

> "The relationship of principal and agent is not dependent upon an express agreement of the parties—it may be implied from either words or conduct of the parties depending upon the circumstances of the case." *Popejoy v. Eastburn,* 24 [241] Iowa 247, [747], 41 N.W.2d 764, 768 (1950).

> " ' * * * This court looks at the record [when reviewing summary judgment] from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.' " *Roth v. First Security Bank of Rock Springs, Wyoming,* Wyo., 684 P.2d 93, 95 (1984), quoting from *Reno Livestock Corporation v. Sun Oil Company,* Wyo., 638 P.2d 147, 150 (1981).

To give summary judgment on the basis that the father had no control over the actions of the son is to say no inference favorable to appellant could be made from, among others, the following:

> "Q.   * * * I would think at some point after you knew you had a license, you said, gees, maybe I will take Steve and you would call Steve up and have him over for Sunday dinner and say, I got a sheep license; why don't we go hunting, and he will say, I will check and—
>
> "A.   I suppose, yeah, yeah." Appellee-father's deposition.
>
> "A.   The agreement was, dad takes the first shot, and if dad don't hit it, back me up * * *." Appellee-father's deposition.
>
> "A.   All he [father] said was it would *be okay* if I went ahead and tried [to kill a sheep]." (Emphasis added.) Appellee-son's deposition.
>
> "A.   He said that, you know, if we had a chance to get the sheep, that I *could* go ahead and try." (Emphasis added.) Appellee-son's deposition.

A favorable inference drawn is that the father *might,* or more realistically did,

State ex rel. Hopkinson v. District Court, Teton County, Wyo., 696 P.2d 54, cert. denied — U.S. ——, 106 S.Ct. 187, 88 L.Ed.2d 155 (1985); *Hopkinson v. State,* Wyo., 679 P.2d 1008 (1984), cert. denied 469 U.S. 873, 105 S.Ct. 228, 83 L.Ed.2d 157 (1984); *Hopkinson v. State,* Wyo., 664 P.2d 43, cert. denied 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Tison v. Arizona,* — U.S. — –, 107 S.Ct. 1676, 95 L.Ed.2d 127, reh. denied — U.S. ——, 107 S.Ct. 3201, 96 L.Ed.2d 688 (1987).

have some control over the actions of the son.

A reasonable inference of some control could arise from the statements made in the appellees' affidavits. How much control was exercised is a jury question. *Holly Sugar Corporation v. Perez*, Wyo., 508 P.2d 595, 598 (1973). At a minimum, the argument raised by the appellant is legitimate, i.e., the father exercised a negative control in that he could have said, "Son, you may not hunt on my hunting license because it is illegal to do so." This argument is side-stepped by the court.

To bolster its position, the majority moves from *Noonan v. Texaco, Inc.*, supra, to *Nicholas v. Moore*, supra. What the court does not distinguish is that Nicholas was not a summary-judgment affirmance. "The case was tried to the Superior Court," 570 P.2d at 176. I have no problem in accepting Nicholas, supra, because all critical questions were resolved by the trier of fact.

Noteworthy also is the rule enunciated in *Fegler v. Brodie*, Wyo., 574 P.2d 751, 754 (1978), that summary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts.

> * * * "If the evidence is subject to conflicting interpretations or reasonable minds might differ as to its significance, summary judgment is improper." *Weaver v. Blue Cross-Blue Shield of Wyoming*, Wyo., 609 P.2d 984, 987 (1980).

The following comes together to form a reasonable interpretation of agency which conflicts with that of the majority:

1. Goal: Acquire trophy animal for father.

2. Control: Only father is legally eligible to acquire.

3. Support: Trip organized and costs advanced by father.

4. Pursuit: At hunting site, son sent out with father's gun to shoot trophy animal.

5. Claim: Instead, son, in pursuit of goal, negligently shot and killed guide.

> "The motion for summary judgment should be sustained in the absence of a real and material fact issue considering movant's burden, respondent's right to the benefit of all favorable inferences and any reasonable doubt, with credibility questions to be resolved by trial." *Cordova v. Gosar*, supra, 719 P.2d at 640.

When reviewing an appellant's claim that a jury verdict is clearly erroneous and against the great weight of the evidence, we have said:

> "We assume the evidence of the successful party is true, leave out of consideration entirely evidence of the unsuccessful party in conflict therewith, and give the evidence of the successful party every favorable *inference* which may reasonably be drawn from it." (Emphasis added.) *DeJulio v. Foster*, Wyo., 715 P.2d 182, 185 (1986).

A jury could find agency and consequent impressed liability of father as principal for whose benefit the effort was undertaken, when negligent performance caused damage. I believe we would not reverse such a jury decision, and I see summary judgment as inappropriate.

## CONCLUSION

In conclusion, I see this court pronouncing that under the facts of this case, sending a person to shoot your game animal for trophy purposes does not affix liability to you as the principal when the dispatched person as your agent kills the guide rather than the mountain sheep. In disagreement with such an unjustified rule, I respectfully dissent.