# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 44

APRIL TERM, A.D. 2022

April 5, 2022

LASHAWN WEIR,

Appellant
(Plaintiff),

v.

S-21-0180

EXPERT TRAINING, LLC, a Wyoming
limited liability company,

Appellee
(Defendant).

*Appeal from the District Court of Natrona County*
*The Honorable Catherine E. Wilking, Judge*

*Representing Appellant:*
Mel C. Orchard, III, Noah W. Drew, and Emily S. Madden, The Spence Law Firm, LLC, Jackson, Wyoming. Argument by Mr. Drew.

*Representing Appellee:*
Monty L. Barnett, Nicholas B. Klann, E. Catlynne Shadakofsky, and Adam J. Goldstein, White & Steele, P.C., Denver, Colorado. Argument by Mr. Goldstein.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

\* Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    LaShawn Weir was injured when she fell from Sunrise Shopping Center's (Shopping Center) attic to the floor below.  Ms. Weir sued several entities, some with overlapping ownership: the Shopping Center's owner—Casper Sunrise, LLC (Casper Sunrise), various property management companies—Property MGMT Services, Inc. (Property MGMT) and PM Real Estate Management, Inc. (PM Real Estate), a roofing contractor—Randy Day d/b/a Day Enterprises, and a staffing company that provided janitorial and maintenance workers to the Shopping Center—Expert Training, LLC (Expert Training).  Ms. Weir settled with all defendants except Expert Training.  The district court granted summary judgment in favor of Expert Training, finding in relevant part that Expert Training was not engaged in a joint venture and that it owed no duty to Ms. Weir.  Ms. Weir appeals and we affirm.

## ISSUES

[¶2]    The dispositive issues, which we rephrase, are:

1.    Are there genuine issues of material fact precluding summary judgment on Ms. Weir's claim that a joint enterprise exists between Casper Sunrise, Property MGMT, PM Real Estate, and Expert Training, such that Expert Training can be jointly liable for Ms. Weir's accident?

2.    Did Expert Training owe Ms. Weir a duty to inspect and maintain the attic?

## FACTS

**The Shopping Center**

[¶3]    Casper Sunrise owns the Shopping Center, a strip mall located in Casper, Wyoming.  Casper Sunrise leased one of the units in the Shopping Center to Prime Time Pub and Grill (Prime Time), a restaurant, bar, and bowling alley.

[¶4]    The Shopping Center has an attic that is several stories high and long enough to "punt a football across."  The attic floor joists were covered by a plywood walkway that was nailed down and other areas were covered by plywood decking that was not nailed down.  The attic was not well lit.  Some areas had nonfunctioning mercury vapor lights hanging from the ceiling.  Other areas had no lights.

**The Accident**

1

[¶5]   Ms. Weir was the general manager for Prime Time.  Ms. Weir periodically made trips to the Shopping Center attic to retrieve items that Prime Time stored there.  On November 27, 2016, she made three trips to the attic to gather Christmas decorations.  These were stored in an area where there were no lights, and Ms. Weir used her phone flashlight for illumination.  Ms. Weir's boss had warned her to remain on the attic walkway.

[¶6]   On her first trip to the attic, Ms. Weir noticed that the plywood decking near the Christmas decorations had been moved, leaving uncovered insulation and a two- to three-foot gap between the decking and the walkway.  To reach the decorations, she needed to keep one foot on the walkway and place the other on the plywood decking, straddling the gap.  Twice, she successfully retrieved decorations and brought them down to Prime Time.  On her third trip, she again straddled the gap and picked up a box of decorations.  As she stood and turned to step back completely onto the pathway, she fell through the gap landing on the concrete floor thirteen feet below.

[¶7]   As a result of her fall, Ms. Weir broke her arm and multiple teeth; tore her rotator cuff and bicep; shattered her pelvis; crushed her spinal discs at L6 and C4-6; and damaged nerves in her hips, legs, and spine.  She suffers from carpal tunnel in both wrists and experiences post-traumatic stress disorder.  She was wheelchair bound for four months and continues to receive treatment for chronic pain and physical ailments.

**Ownership and Management of the Shopping Center**

[¶8]   Casper Sunrise is owned by NLV Partners, LLC, a California company.  Two of its members, Charles Hawley and Steve Resnick, were also partners in Property MGMT and are partners in PM Real Estate Management.  Mr. Hawley negotiates contracts and leases on behalf of Casper Sunrise.

[¶9]   In 2004 when Casper Sunrise acquired the Shopping Center, it hired Standard Parking Corporation (Standard Parking) to provide property management, maintenance, and janitorial services.  Susan Hawley (Mr. Hawley's wife) worked for Standard Parking, and as part of her responsibilities, undertook the property management of the Shopping Center.  Casper Sunrise's investors were unhappy with Standard Parking for various reasons including expense and staffing issues.  They determined they could alleviate some of these concerns by hiring Expert Training to provide some of the services (janitorial and maintenance) that Standard Parking was providing.  In 2013, Casper Sunrise began using Expert Training to provide janitorial and maintenance personnel for the Shopping Center but kept Standard Parking as its property manager, and Mrs. Hawley continued to manage the Shopping Center as an employee of Standard Parking.

[¶10]  Expert Training, a California-based company, originally owned by Mrs. Hawley, was initially formed to provide computer training to businesses.  In 2005 or 2006, Expert

2

Training began providing employees for janitorial and maintenance services for various businesses in Casper, Wyoming. Currently, Mr. and Mrs. Hawley each own 50% of Expert Training.

[¶11] In 2013, Casper Sunrise replaced Standard Parking as the property manager for the Shopping Center, contracting instead with Property MGMT for these services. In 2016, Property MGMT dissolved, and PM Real Estate Management (PM Real Estate) began managing the property. Property MGMT and PM Real Estate have similar, but not identical, ownership. The partners in Property MGMT were Steve Resnick, Bob Gottsch, Dale Stark, Chuck Hawley, and one other unidentified person. The partners in PM Real Estate are Steve Resnick, Bob Gottsch, Dale Stark, and Chuck Hawley.

[¶12] When Property MGMT took over management of the Shopping Center, Standard Parking, and consequently Mrs. Hawley, stopped managing the property. Property MGMT and PM Real Estate employed Ryan Herden as the person responsible for management of the Shopping Center. He was in this capacity at the time of Ms. Weir's fall in November 2016. In March 2017, Mr. Herden resigned, and PM Real Estate hired Mrs. Hawley as its day-to-day manager for the Shopping Center and other properties it managed.[1] Expert Training provided janitorial and maintenance services separate from property management throughout this time.[2] At the time of Ms. Weir's accident, Daniel Sorensen, an employee of Expert Training, was responsible for janitorial and maintenance services at the Shopping Center. He reported to Mr. Herden (the property manager employed by Property MGMT and then PM Real Estate).

[¶13] When Mr. Sorensen encountered a minor maintenance issue, he would repair it himself, if he could. If a repair was beyond his abilities, he would inform "management" so that a contractor could be hired. Minor projects—lawn mowing, replacing light bulbs, minor sprinkler repair, and painting—were within his purview. He was not responsible for, and never performed, major projects such as roofing. While he thought the attic walkway was safe, Mr. Sorensen believed the plywood decking was unsafe and should be removed and that tenants should not be permitted to use the attic for storage. Prior to the accident, Rob Caputa, the owner of Prime Time, had complained more than once about the attic's conditions. These complaints were made to Mr. Sorensen and to the Hawleys. He testified that his concerns "fell on deaf ears."

**Procedural History**

---

[1] Mrs. Hawley was not involved with Property MGMT and had no role in the management of the property between the time she left Standard Parking and the time she was hired by PM Real Estate after Mr. Herden left in 2017.

[2] Expert Training hires personnel and then bills for their time.

[¶14] In January 2018, Ms. Weir sued Casper Sunrise, asserting claims of negligence and premises liability. In May 2019, she amended her complaint to add, as defendants, PM Real Estate, Property MGMT, Expert Training, and Randy Day d/b/a Day Enterprises (a roofing contractor hired by Casper Sunrise). She asserted claims of negligence, premises liability, joint enterprise, and negligent hiring against Casper Sunrise, Property MGMT, PM Real Estate, and Expert Training. She alleged that Randy Day d/b/a Day Enterprises was negligent. Expert Training moved for summary judgment on all claims, and the district court granted that motion in April 2020. In April 2021, all the remaining parties settled with Ms. Weir. Ms. Weir appeals the district court's summary judgment in favor of Expert Training, requesting the Court reverse the district court's summary judgment on her joint enterprise and negligence claims.

## STANDARD OF REVIEW

[¶15] A district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P. 56(c) (2016). The party moving for summary judgment bears the initial burden of establishing a prima facie case that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. *Dimick v. Hopkinson*, 2018 WY 82, ¶ 7, 422 P.3d 512, 516 (Wyo. 2018). "Once a prima facie showing is made, the burden shifts to the party opposing the motion to present evidence showing that there are genuine issues of material fact." *Id.* (quoting *Bogdanski v. Budzik*, 2018 WY 7, ¶ 18, 408 P.3d 1156, 1160–61 (Wyo. 2018)).

[¶16] We review a district court's decision to grant summary judgment de novo, using the same materials and following the same standards as the district court. *Dimick*, ¶ 7, 422 P.3d at 516–17. "We view the record 'from the vantage point most favorable to the party who opposed the motion, and . . . give that party the benefit of all favorable inferences that may fairly be drawn from the record.'" *Id.* (quoting *Stevens v. Anesthesiology Consultants of Cheyenne, LLC*, 2018 WY 45, ¶ 24, 415 P.3d 1270, 1279 (Wyo. 2018)). "Summary judgments are not favored in negligence actions and are subject to exacting scrutiny," but where there is no genuine issue as to any material fact and the prevailing party is entitled to judgment as a matter of law, the entry of summary judgment is proper. *Bogdanski*, ¶ 18, 408 P.3d at 1161 (quoting *Amos v. Lincoln Cnty. Sch. Dist. No. 2*, 2015 WY 115, ¶ 15, 359 P.3d 954, 958–59 (Wyo. 2015)).

I.   *Are there genuine issues of material fact precluding summary judgment on Ms. Weir's claim that a joint enterprise exists between Casper Sunrise, Property MGMT, PM Real Estate, and Expert Training, such that Expert Training can be jointly liable for Ms. Weir's accident?*

[¶17]   Ms. Weir alleged that Expert Training, Casper Sunrise, Property MGMT, and PM Real Estate were engaged in a joint enterprise and, as a result, Expert Training is jointly liable for the negligent acts and omissions of other members of the joint enterprise leading to her accident.  The district court granted summary judgment in favor of Expert Training on the joint enterprise claim.  On appeal, Ms. Weir argues genuine issues of material fact and reasonable inferences from the undisputed facts demonstrate "a significantly intertwined and effectively co-dependent relationship amongst Casper Sunrise, Expert Training, Property MGMT, and PM Real Estate" precluding summary judgment on her joint enterprise claim.

[¶18]   A joint venture, or joint enterprise, is "a contractual relationship of mutual agency . . . [by] which the negligence of one member . . . may be imputed to another." *Dimick*, ¶ 28, 422 P.3d at 522 (quoting *Holliday v. Bannister*, 741 P.2d 89, 93 (Wyo. 1987)).  If Expert Training was engaged in a joint venture with Casper Sunrise, Property MGMT, and PM Real Estate, the negligence of these enterprises, if proven, may be imputed to Expert Training.  *See id.*

[¶19]   To establish a joint venture, a plaintiff must show:

> (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice *in the direction of the enterprise*, which gives an equal right of control.

*Popejoy v. Steinle*, 820 P.2d 545, 549 (Wyo. 1991) (emphasis added) (quoting Restatement (Second) of Torts § 491 cmt. c (Am. L. Inst. 1965)), *see also Dimick*, ¶ 29, 422 P.3d at 522.

[¶20]   Ms. Weir contends that there are genuine issues of material fact regarding each of these elements.  Because it is dispositive, we address only the fourth element: "an equal right to a voice in the direction of the enterprise, which gives an equal right of control."  Ms. Weir argues that our focus should be on whether all the entities had a joint right to control **the attic**, and not on whether they had a joint right to control the direction or management of the Shopping Center.  She cites several cases to support her position: *Porter v. Wilson*, 357 P.2d 309, 313–16 (Wyo. 1960), *Endresen v. Allen*, 574 P.2d 1219, 1226–27 (Wyo. 1978), *Holliday*, 741 P.2d at 91–93.  These cases are distinguishable from the case at bar.

[¶21]   In *Porter*, 357 P.2d at 313–16, the Court considered whether the wife, a passenger at the time of an auto accident, could be vicariously liable for her husband's alleged negligence while driving her automobile.  The question in *Porter* was whether the husband

5

was acting as his wife's agent. The deciding factor was the wife's "right of control" over the vehicle. We held:

> There was some testimony on this point, and while it is not conclusive, the fact remains that the husband was in physical and actual possession of the vehicle, directing it as he desired, without instruction or suggestion from anyone, and that the wife had no *actual* control whatever; nothing was presented to the trial court showing the contrary. The implicit finding of the trial court that plaintiff was not in control was therefore based upon substantial evidence. We think this court cannot with propriety overthrow such a finding.

*Id.* at 316.

[¶22] *Porter* turned on whether there was a principal-agent relationship between the husband and the wife. The Court examined the degree of control the parties had over the dangerous instrument—the automobile—to determine whether a principal-agent relationship existed. Here, the question is not one of agency, but of joint venture. *Porter* does not support the proposition that control of the attic should be the focus in determining whether a joint venture exists in this case.

[¶23] In *Endresen*, 574 P.2d at 1226–27, a dog chased the plaintiff as he rode his motorcycle, causing him to crash. The plaintiff sued the husband and wife owners of the dog, alleging that the wife knew the dog had a propensity to chase vehicles and that knowledge was imputable to her husband. The district court granted summary judgment in favor of the husband, and we reversed. *Endresen* discussed the law regarding both joint enterprise and agency, as applied to damage caused by animals. Notably, we recognized that "while **agency** is not inherent in the marital relation the essence of the action is not ownership, but the keeping and harboring of an animal, knowing it to be vicious." We commented,

> [o]n **principles familiar to the law of agency**, the knowledge of the wife, acquired within the scope of the common enterprise or undertaking, [could be] imputable to her husband. . . . **The element of common enterprise, or as it is often termed, joint enterprise, is of material importance in this case.**

*Id.* at 1226 (emphasis added).

[¶24] We concluded:

6

We believe questions of fact existed as to the relationship between the two defendants in their ownership and control of the dog and that there was no basis for a decision by the trial judge as a matter of law. We are therefore of the opinion that the question of liability of [husband] should not be decided until there has been a full development of the facts.

*Id.* at 1227.

[¶25] One could conclude that control of the dog was determinative as to whether a joint enterprise existed in *Endresen*. However, almost ten years after *Endresen* was decided, the Court was presented with a similar joint enterprise question in *Holliday*, 741 P.2d at 91–93. In *Holliday* we refined the circumstances under which a joint enterprise can be found in Wyoming, rejecting the application of joint venture theories in cases of social cooperation, absent a business enterprise.

[¶26] In *Holliday*, we considered whether a father could be liable when his son, using the father's rifle, negligently shot and killed a hunting guide. The guide's estate sued both the son and his father, alleging in part that the father was liable because he and his son were engaged in a joint enterprise. The district court granted summary judgment to the father. On appeal, the estate argued that there were issues of fact as to whether there was a joint enterprise between the two. *Id.* at 93.

[¶27] Ms. Weir asserts that the *Holliday* Court focused on whether the parties had joint control of the rifle. In its analysis of the joint venture issue, the Court did not consider control of the rifle. Rather, it affirmed summary judgment on the joint venture claim, reasoning that a joint venture necessarily requires "a common business, financial or pecuniary interest" which was not present in the case. *Id.* at 94. The Court stated:

We are convinced . . . that the pecuniary, commercial and business aspects of a joint enterprise are the missing elements necessary to create vicarious liability in the [father]. [Father] and his son were merely on a father-son outing to hunt which had been their pleasure on a number of previous occasions. That they shared the expense of the trip is of little consequence as noted by the law which we have enunciated. There was absent the contract, a profit motive and equal right of control found in and required by the business relationship of a joint enterprise. Any attempt to warp such a relationship to fit a social event would be unbecoming of the law.

*Holliday*, 741 P.2d at 94 (citing *Easter v. McNabb*, 541 P.2d 604 (Idaho 1975) (affirming "summary judgment . . . in a case involving a fishing trip and refus[ing] to impute

7

negligence to other members of the fishing party not charged with negligence, holding that as a matter of law no joint enterprise existed"); *Hall v. Blackham*, 417 P.2d 664 (Utah 1966) (the doctrine of joint enterprise would not be applied to situations which were merely matters of friendly or social cooperation and accommodation where the reason for placing liability is not the same as if they were engaged in business or a commercial venture); *Edlebeck v. Hooten*, 121 N.W.2d 240 (Wisc. 1963) (the concept of joint adventure or enterprise is to be confined to business enterprises for purposes of imputation of negligence and was inapplicable to a deer hunting trip for pleasure or sport, even though there was a sharing of the game and expenses)).

[¶28] The *Holliday* opinion renders the joint venture portion of the analysis in *Endresen* irrelevant. In *Endresen*, like *Holliday*, there was no evidence of a business enterprise. Contrary to Ms. Weir's assertion, the *Holliday* Court did not consider joint control in its analysis of whether a joint venture existed. Neither *Holliday* nor *Endresen* provide direction regarding the focus of our inquiry and whether it should be directed at the right to control the attic or the broader right to control the enterprise as a whole.

[¶29] The more recent case of *Dimick* is, however, instructive. Mr. Dimick was injured when he fell into a septic tank located on the ranch where he was camping. *Dimick*, ¶ 1, 422 P.3d at 515. Mr. Dimick sued Mr. Hopkinson, who was the sole owner of the ranch and campground where Mr. Dimick was injured, and Mr. Hopkinson's wife, who "helped" her husband run the ranch and campground. *Id.* ¶¶ 3, 32, 422 P.3d at 515, 522. Mr. Dimick alleged that the Hopkinsons were engaged in a joint venture, which rendered Mrs. Hopkinson liable for any negligence on the part of her husband. The district court granted summary judgment on the joint venture claim. *Id.* ¶ 26, 422 P.3d at 521. On appeal, Mr. Dimick argued that there were questions of fact precluding summary judgment.

[¶30] In *Dimick* we concluded that Mr. Dimick did not present evidence establishing the fourth element of a joint venture (an equal right to a voice in the direction and control of the enterprise). *Id.* ¶ 33, 422 P.3d at 523. To establish an equal right to control, "[e]ach party to the joint venture must have an 'equal right to direct and govern the movements and conduct of each other with respect thereto. Each must have some voice and right to be heard in its control or management.'" *Id.* ¶ 30, 422 P.3d at 522 (quoting *Est. of Hernandez by Hernandez-Wheeler v. Flavio*, 930 P.2d 1309, 1312 (Ariz. 1997)). Further, "there [must be] an *understanding* between the parties that [each] has the right and is possessed of equal authority[.]" *Id.* ¶ 31, 422 P.3d at 522 (citations omitted). "In short, to establish equal right of control, the proponent must prove that the parties agreed, either expressly or impliedly, that each possesses a privilege to control the venture." *Id.*

[¶31] The inquiry in this case, then, is whether there are disputed facts as to Expert Training's right to control the "venture"—the Shopping Center as a whole. There is no evidence in the record indicating that Expert Training had authority to speak for Casper Sunrise or otherwise control how the Shopping Center was run. Mr. Hawley testified that

8

Expert Training "has no management role in" the Shopping Center. Expert Training personnel took direction from the property management companies, Standard Parking, Property MGMT, or PM Real Estate, and their respective employees responsible for day-to-day property management. At the time of Ms. Weir's accident, PM Real Estate, through its employee Mr. Herden, was the property manager.

[¶32] Ms. Weir points to Mr. Hawley's ownership interest in Casper Sunrise, PM Real Estate (and its predecessor, Property MGMT), and Expert Training to argue that these companies were engaged in a joint venture. This fact does not, however, create an issue of fact regarding the existence of a joint venture. Common ownership without more does not establish Expert Training had a right of control over the enterprise. The record shows that each of the companies are separate and distinct legal entities. Casper Sunrise is an LLC, PM Real Estate and Property MGMT are incorporated, and Expert Training is an LLC. Mr. Hawley is 4% owner in Casper Sunrise and a 50% owner in Expert Training. PM Real Estate and Property MGMT have a different mix of owners. Each company was formed by different individuals at different times, and each company has a different ownership structure. There is no evidence that funds were comingled between the companies. Property MGMT and PM Real Estate manage other properties in addition to the Shopping Center. Expert Training provides janitorial and maintenance staffing to businesses other than the Shopping Center.

[¶33] There is no evidence in the record that Expert Training had a voice in the direction and control of the Shopping Center. Ms. Weir does not establish genuine issues of material fact regarding Expert Training's "equal right to a voice in the direction of the enterprise, which gives an equal right of control." Without the fourth element of a joint venture—an equal right to a voice in the direction of the enterprise, which gives an equal right of control—Mrs. Weir's joint venture claim fails as a matter of law. We affirm the district court's summary judgment on that claim.

## II. Did Expert Training owe Ms. Weir a duty to inspect and maintain the attic?

[¶34] The district court granted summary judgment on Ms. Weir's negligence claim against Expert Training. The elements of negligence are: "(1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the breach proximately caused injury to the plaintiff; and (4) the injury is compensable by money damages." *RB, Jr. by & through Brown v. Big Horn Cnty. Sch. Dist. No. 3*, 2017 WY 13, ¶ 13, 388 P.3d 542, 546–47 (Wyo. 2017) (citing *Valance v. VI-Doug, Inc.*, 2002 WY 113, ¶ 8, 50 P.3d 697, 701 (Wyo. 2002)). The district court found that Expert Training owed no duty to protect Ms. Weir from the attic's dangerous conditions and that Expert Training did not proximately cause Ms. Weir's accident. Ms. Weir appeals, contending that Expert Training had a duty to repair the attic and its failure to do so proximately caused her fall. We address only the dispositive question of whether Expert Training owed Ms. Weir a duty.

9

[¶35] Generally, the existence of a duty is a question of law. *Burns v. Sam*, 2021 WY 10, ¶ 10, 479 P.3d 741, 744 (Wyo. 2021). A duty may arise from contract, statute, common law, or when "such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other." *Burns*, ¶ 11, 479 P.3d at 745; *Rice v. Collins Commc'n, Inc.*, 2010 WY 109, ¶ 10, 236 P.3d 1009, 1014 (Wyo. 2010). Ms. Weir argues that the parties' relationship imposed a duty upon Expert Training to repair and maintain the Shopping Center's attic lighting and floor.

[¶36] Determining whether such a duty exists involves balancing the factors originally set forth in *Gates v. Richardson*, 719 P.2d 193, 196 (Wyo. 1986):

> (1) the foreseeability of harm to the plaintiff,
>
> (2) the closeness of the connection between the defendant's conduct and the injury suffered,
>
> (3) the degree of certainty that the plaintiff suffered injury,
>
> (4) the moral blame attached to the defendant's conduct,
>
> (5) the policy of preventing future harm,
>
> (6) the extent of the burden upon the defendant,
>
> (7) the consequences to the community and the court system, and
>
> (8) the availability, cost and prevalence of insurance for the risk involved.

*Burns*, ¶ 12, 479 P.3d at 745 (quoting *Lucero v. Holbrook*, 2012 WY 152, ¶ 10, 288 P.3d 1228, 1233 (Wyo. 2012)).

[¶37] Foreseeability, the most important of these factors, "is the fulcrum on which duty—its existence or absence—rests." *Id.*

> Generally[,] a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks which make the conduct unreasonably dangerous. Foreseeability establishes a 'zone of risk,' which is to say that it forms a basis for assessing whether the conduct creates a generalized and foreseeable risk of harming others.

*Id.* (quoting *Wood v. CRST Expedited, Inc.*, 2018 WY 62, ¶ 11, 419 P.3d 503, 508 (Wyo. 2018)) (citing 57A Am. Jur. 2d *Negligence* § 121, at 196 (2004) ("The most important consideration in the determination of whether the defendant owed the plaintiff a duty is whether the [plaintiff] was foreseeably endangered by the defendant's conduct.")). The "concept of foreseeability refers to generalized risks of the type of incidents and injuries that occurred rather than predictability of the actual sequence of events[.]" *Warwick v. Accessible Space, Inc.*, 2019 WY 89, ¶ 45, 448 P.3d 206, 219 (Wyo. 2019) (quoting *Miller ex rel. Miller v. Tabor W. Inv. Co., LLC*, 196 P.3d 1049, 1058 (Or. Ct. App. 2008)). "It is sufficient to show 'the act in question may in human probability produce harm to persons similarly situated.'" *Id.* ¶ 41, 448 P.3d at 219 (quoting *Endresen*, 574 P.2d at 1222).

[¶38]   We must first determine whether Expert Training's conduct foreseeably endangered Ms. Weir. Ms. Weir contends that "it is sufficient that Mr. Sorens[e]n and the Hawleys were aware that the plywood [decking] was *moveable*, and that they all considered [that condition] unreasonably dangerous."[3] Ms. Weir points to no specific conduct on the part of Expert Training connected to her injuries. Expert Training's sole connection to the Shopping Center (and its attic) at the time of Ms. Weir's accident was through its employee, Mr. Sorensen. Mr. Sorensen's duties were limited to routine maintenance and repair. He reported to and took direction from the property manager—PM Real Estate through its employee Mr. Herden. There is no evidence that the property managers asked Mr. Sorensen or other Expert Training personnel to check for hazards in the attic or to fix them, if discovered. Mr. Herden, not Mr. Sorensen, took it upon himself to inspect the attic on a quarterly basis. Expert Training had no contractual obligation to maintain or inspect the attic, and there is no evidence that it implicitly took on such a responsibility. Its only obligation was to provide maintenance and custodial employees. Its obligations are too far removed from the attic and the conditions in the attic to render Ms. Weir's accident foreseeable to Expert Training.

[¶39]   The second factor—closeness of the connection between Expert Training's conduct and the injury suffered—weighs against finding a duty. The cause of Ms. Weir's injuries was removed from Expert Training's actions and responsibilities.

[¶40]   The third factor—the degree of certainty that Ms. Weir suffered injury—weighs in favor of finding a duty.

[¶41]   The fourth factor—the moral blame attached to Expert Training's conduct—does not support the finding of a duty.

---

[3] Casper Sunrise, Prime Time, and PM Real Estate knew about the conditions in the attic, and Casper Sunrise and PM Real Estate decided not to fix those conditions.

This factor is used to determine whether the defendant is morally culpable before imposing liability. Moral blame generally results from situations in which the defendant had direct control over establishing and ensuring proper procedures to avoid the harm caused or where the defendant is the party best in the position to prevent the injury.

*Larsen v. Banner Health Sys.*, 2003 WY 167, ¶ 30, 81 P.3d 196, 205 (Wyo. 2003). Viewing the facts in the light most favorable to Ms. Weir, we conclude that Expert Training is not morally culpable. It did not have direct control over the attic or its condition. It did not have the ability to ensure steps were taken to avoid the harm. Expert Training was not the party in the best position to prevent Ms. Weir's injuries.

[¶42] Likewise, the fifth and sixth factors—the policy of preventing future harm and the burden upon the defendant—do not weigh in favor of finding a duty. If Expert Training is not the party in the best position to have prevented Ms. Weir's injuries, *see* preceding paragraph, imposing liability on it is not likely to prevent future harm in similar situations. Imposing a duty to monitor and repair worksite conditions, where Expert Training does not own or control the property, would be unduly burdensome to a staffing company whose sole function is to provide maintenance and janitorial employees, and where those employees answer to third party property managers. Imposing such a duty would force staffing companies to inspect and repair conditions of premises to which they have no access, no control, and no interest.

[¶43] The final two factors—the consequences to the community and the court system, and the availability, cost and prevalence of insurance for the risk involved—are neutral. Ms. Weir contends that "it is difficult to envision 'a great number of plaintiffs racing to the courts to file similar claims' if a duty were imposed" on Expert Training. Expert Training counters that a duty would "lead to an expanded burden on the court system—cases like [this] would invariably and unnecessarily drag on long after the truly responsible parties . . . have settled the claims against them." Ms. Weir contends that Expert Training has a commercial liability insurance policy that insures against its negligence, and, as a result, the insurance factor weighs in favor of finding a duty. The parties argue their claims without support requiring us to speculate as to which, if either, is correct. We do not consider either of these factors to weigh for or against imposing a duty.

[¶44] We have said that:

[i]n deciding whether to adopt a particular tort duty, a court's focus must be much broader than just the case at hand:

"[T]he courts have merely 'reacted to the situation in the way in which the great mass of mankind customarily

12

react,' and that as our ideas of human relations change the law as to duties changes with them. Various factors undoubtedly have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and many others. Changing social conditions lead constantly to the recognition of new duties. No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." Prosser & Keaton on Torts, § 53, pp. 357–359 (5th ed.1984).

" * * * The judge's function in a duty determination involves complex considerations of legal and social policies which will directly affect the essential determination of the limits to government protection. Consequently, * * * the imposition and scope of a legal duty is dependent not only on the factor of foreseeability. ([*Cunis v. Brennan*,] 56 Ill. 2d 372, 375, 308 N.E.2d 617) but involves other considerations, including the magnitude of the risk involved in defendant's conduct, the burden of requiring defendant to guard against that risk, and the consequences of placing that burden upon the defendant. [Citations.]" *Nelson by Tatum v. Commonwealth Edison Company*, 124 Ill. App. 3d 655, 662, 80 Ill. Dec. 401, 465 N.E.2d 513, 519 (1984).

*Mostert v. CBL & Assoc.*, 741 P.2d 1090, 1093 (Wyo. 1987).

*Killian v. Caza Drilling, Inc.*, 2006 WY 42, ¶ 8, 131 P.3d 975, 980 (Wyo. 2006). Here, after weighing the factors, we decline to impose a duty on Expert Training where it had no control over the conditions of the premises or the management company's response to the hazardous conditions.

### CONCLUSION

[¶45] The district court properly granted summary judgment on Ms. Weir's joint enterprise and negligence claims. There are no genuine issues of material fact that might establish there was a joint enterprise between Casper Sunrise, Property MGMT, PM Real

Estate, and Expert Training. Expert Training did not owe Ms. Weir a duty to inspect and maintain the attic. We affirm.